THE DELCON GROUP, INC., *et al.*, Plaintiffs-Appellees, v. NORTHERN TRUST CORPORATION *et al.*, Defendants-Appellants.

Second District   No. 2—88—0432

Opinion filed August 25, 1989.

Dennis M. O'Dea and David E. Schaper, both of Keck, Mahin & Cate, and Douglas A. Poe and James D. Holzhauer, both of Mayer, Brown & Platt, both of Chicago (Stephen M. Shapiro, of counsel), for appellants.

Barbara L. Yong, of Siegan, Barbakoff & Gomberg, of Chicago (Ronald P. Kane, of counsel), for appellees.

JUSTICE LINDBERG delivered the opinion of the court:

Defendants, Northern Trust Bank/Naperville (the Bank); the Bank's parent, Northern Trust Corporation (the Corporation); and a

former loan officer of the Bank, James V. Zaring, appeal from judgments entered on six verdicts in favor of plaintiffs Jon C. Ginder, chief executive officer and sole shareholder of the corporate plaintiffs; and Delcon Group, Inc., and its subsidiaries Delcon, Inc., Kane Environmental Systems, Inc. (Kane), Midwest Delta Contractors, Inc., and Delcon Realty and Development, Inc. (referred to collectively as Delcon). The verdict on count I (fraud) was against all three defendants and awarded plaintiffs $400,000 actual and $500,000 punitive damages. The verdicts on counts II through VI were only against the Bank and the Corporation and awarded $300,000 actual damages for count II (breach of oral contract); $50,000 actual damages for count III (breach of oral contract); $50,000 actual and $200,000 punitive damages for count IV (intentional interference with contractual relations); $200,000 actual and $500,000 punitive damages for count V (intentional interference with prospective economic advantage); and $200,000 actual damages for count VI (breach of written contract). These were the causes of action alleged in the complaint, and our analysis of this case is, of course, restricted to these causes of action.

The court notes at the outset that the briefs of the parties contained statements of facts which egregiously violated Supreme Court Rule 341(e)(6) (113 Ill. 2d Rules 341(e)(6), (f)). These statements of facts contained conclusions, argument, and extensive commentary on the facts. (See 113 Ill. 2d R. 341(e)(6).) Because such matters were not in the record, there was, and could be, no citation to the record for the commentary, argument, and conclusions. (See 113 Ill. 2d R. 341(e)(6).) Pursuant to this court's order during oral argument, the parties after oral argument submitted revised statements of facts edited to eliminate the improper material. The court expresses its gratitude to the parties for their prompt compliance with its order and for the excellent revised statements of facts. The revised statements of facts were most helpful aids to the court in understanding and in locating the relevant portions of the lengthy record in this complex case.

Defendants raise seven issues on appeal. They contend that the trial court erred in refusing (1) "to direct a verdict and to grant judgment NOV" for defendants on counts II and III "because, as a matter of law, the Bank did not orally agree to lend additional money to Delcon"; (2) "to instruct the jury that, before an oral contract can exist, there must be a meeting of the minds as to definite and certain contract terms"; (3) "to direct a verdict and to grant judgment NOV" for defendants on count I "because, as a matter of law, the Bank did not fraudulently misrepresent that it would lend additional money to Delcon"; (4) "to direct a verdict and to grant judgment NOV" for

defendants on count IV "because, as a matter of law, the Bank did not intentionally interfere with Delcon's contractual relations when it refused to lend more money to Delcon"; (5) "to direct a verdict and to grant judgment NOV" for defendants on count VI because, as a matter of law, the Bank did not breach the written 1985 loan agreement when it refused to make further advances; (6) "to direct a verdict and to grant judgment NOV" for defendants on count V "because, as a matter of law, the Bank was justified in mailing direct collection notices to parties it reasonably believed to be Delcon's account debtors"; and (7) "to set aside the verdict [*sic*] because the damages awarded in this case were duplicative, improper as a matter of law, and grossly excessive." Our resolution of the other five issues makes it unnecessary to consider issues (2) and (7). We reverse the judgment of the trial court and enter judgment in favor of defendants on all six counts of the complaint.

The facts necessary to resolution of the issues will be noted when the issues are discussed. A brief overview of the facts will, however, be useful at this point. See *Delcon Group, Inc. v. Northern Trust Corp.* (1987), 159 Ill. App. 3d 275, 276-79, 512 N.E.2d 378, 379-81 (stating the facts of this case relevant to an interlocutory appeal of an order granting a preliminary injunction).

On November 13, 1985, Delcon and the Bank entered into a lending agreement under which the Bank agreed to make a line of credit loan of up to 80%, but no more than $300,000, of Delcon's eligible accounts receivable as evidenced in borrowing base certificates provided to the Bank by Delcon; and a term loan of up to 80%, but no more than $50,000, of the purchase price of machinery and equipment. Among the lending agreement's terms were requirements that Delcon "maintain a working capital ratio of 1.5 to 1; on a consolidated basis" and "maintain a debt-to-equity rate of 3 to 1; on a consolidated basis." The lending agreement also called for the execution of a promissory note and security agreement. Pursuant to these terms of the lending agreement, a master demand note and a security agreement were executed by Delcon on December 11, 1985. Under the terms of these instruments, the Bank obtained a security interest in the inventory, accounts receivable, and all other assets of Delcon. Under the security agreement, "default" included the failure to pay any liability when due or demanded and the insolvency of Delcon.

In February of 1986 the Bank made another loan to Delcon. This was for $310,000 for the purchase of a building to be used by Delcon as its headquarters. At the closing, the parties executed a mortgage, an adjustable rate mortgage loan agreement, and a collateral assignment

of leases and rents.

In the spring of 1986, the parties had several discussions about the Bank's extending an additional $500,000 line of credit to finance Kane's summer asbestos removal projects. The parties disagree over whether they orally contracted for the Bank to make this loan, but agree that the Bank never loaned Delcon any money under this line of credit. The parties also disagree over whether they orally contracted in early June for the Bank to lend Delcon $120,000 for equipment financing, but agree that the Bank never loaned Delcon any money pursuant to this alleged oral contract.

By early June of 1986, Kane was the successful bidder on contracts with six school districts for removal of asbestos that summer. However, in addition to refusing to make the $500,000 line of credit and the $120,000 equipment financing loans, the Bank, based on a borrowing base certificate for May 30, 1986, that it received in the first half of June, refused to lend Delcon any more money under the line of credit in the 1985 loan agreement.

Delcon borrowed $400,000 from Harrison Construction Company at a very high rate of interest so that Kane could perform the asbestos removal contracts with the six school districts. The Bank, to enable Delcon to obtain this loan, agreed that its security interest in the accounts receivable from these six projects would be subordinated to the security interest of the Harrison Construction Company.

In August of 1986 Delcon both stopped making payments to the Bank and was insolvent. On October 1 the Bank declared Delcon in default and accelerated the loan. On October 8 plaintiffs filed this suit. On October 27 the Bank sent collection notice letters to at least 18 individuals or entities, most but not all of whom were current account debtors of Delcon.

The trial court, on motion of plaintiffs, granted a preliminary injunction enjoining the Bank "from collecting the $235,000 due under the master demand note executed by Delcon and from collecting the accounts receivable which secured the note." (*Delcon Group, Inc. v. Northern Trust Corp.* (1987), 159 Ill. App. 3d 275, 278, 512 N.E.2d 378, 380.) On appeal of the order granting the preliminary injunction, this court reversed and remanded for further proceedings. (*Delcon Group, Inc. v. Northern Trust Corp.* (1987), 159 Ill. App. 3d 275, 280, 512 N.E.2d 378, 382.) The cause proceeded to a trial on the merits of plaintiffs' complaint, and the instant appeal is from the final judgment entered on the jury's verdicts following that trial.

■ In the first, third, fourth, fifth, and sixth issues, defendants contend that the trial court erred in not granting judgments *n.o.v.* and

directed verdicts in their favor on all counts of the complaint. Our supreme court has said:

> "In *Pedrick* [*v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504] this court announced the standard to be used in determining when a trial court should enter either a directed verdict or a judgment notwithstanding the verdict. It was said: 'In our judgment verdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' (37 Ill. 2d 494, 510[, 229 N.E.2d 504, 513-14]; see also *Mundt v. Ragnar Benson, Inc.* [(1975)], 61 Ill. 2d 151, 156-57[, 335 N.E.2d 10, 14].)
>
> \* \* \*
>
> \* \* \* The standards relating to the direction of verdicts and to the granting of new trials are of course different. In *Pedrick* this court declared: 'We have rather carefully preserved the distinction between the evidentiary situation which will require a new trial [citation], and that justifying direction of a verdict or judgment *n.o.v.* There is, in our judgment, excellent reason for so differentiating to be found in the radically different results of allowance of the two motions, and we believe a more nearly conclusive evidentiary situation ought to be required before a verdict is directed than is necessary to justify a new trial.' (*Pedrick v. Peoria & Eastern R.R. Co.* [(1967)], 37 Ill. 2d 494, 509-10[, 229 N.E.2d 504, 513].) On a motion for a new trial a court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. [Citations.]" (*Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 309-10, 356 N.E.2d 32, 35-36.)

(See also *Jardine v. Rubloff* (1978), 73 Ill. 2d 31, 36-37, 382 N.E.2d 232, 234.) In the case at bar, defendants have only contended that the trial court erred in failing to enter judgments *n.o.v.* and to direct verdicts, and not for a new trial, so they may prevail only if the evidence so overwhelmingly favored them that no contrary verdicts based on that evidence could ever stand.

The first issue raised by defendants concerns whether they were entitled to judgments on counts II and III because, as a matter of law, plaintiffs failed to prove the existence of the oral contracts allegedly breached by defendants. Count II alleged a contract to increase Delcon's line of credit by $500,000, and count III alleged a contract to loan Delcon $120,000 to purchase equipment.

In *Champaign National Bank v. Landers Seed Co.* (1988), 165 Ill. App. 3d 1090, 519 N.E.2d 957, the court said:

> "The terms of a contract must be reasonably certain. Some terms may be missing or left to be agreed upon, but if the essential term or terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract. Restatement (Second) of Contracts §33 (1981).
>
> An agreement to continue to refinance or roll over a debt appears similar to an oral contract to lend money in the future. A valid cause of action for breach of an oral contract to lend money in the future is recognized in Illinois. (*Wait v. Midwest Bank/Danville* (1986), 142 Ill. App. 3d 703, 707, 491 N.E.2d 795, 800; *Bank of Lincolnwood v. Comdisco, Inc.* (1982), 111 Ill. App. 3d 822, 444 N.E.2d 657.) The party claiming such a contract must show that the alleged agreement contains sufficient definitiveness to be enforceable. (*Wait*, 142 Ill. App. 3d at 708, 491 N.E.2d at 801; *Carrico v. Delp* (1986), 141 Ill. App. 3d 684, 688, 490 N.E.2d 972, 975.) In *Wait* and *Carrico* our court cited *McErlean v. Union National Bank* (1980), 90 Ill. App. 3d 1141, 414 N.E.2d 128, where it was held an agreement to loan money in the future was enforceable only if it contemplated the terms upon which the future loan should be made. The *McErlean* court stated:
>
>> 'These terms would include, for example, the intended duration of the line of credit; the applicable rate of interest to be charged for any loan emanating from such an agreement, or the basis for how such interest would be ascertained; what duration or date or dates were contemplated for maturity of such loans; and what mode or rate of repayment was contemplated, *i.e.*, whether the entire amount would be repayable or if repayment in installments would be acceptable.' 90 Ill. App. 3d at 1146, 414 N.E.2d at 132." (*Champaign National Bank v. Landers Seed Co.* (1988), 165 Ill. App. 3d 1090, 1093-94, 519 N.E.2d 957, 959-60.)

Moreover, one of the elements essential to the formation of a contract is a manifestation of agreement or mutual assent by the parties to its terms, and the failure of the parties to agree upon or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking. *Allen v. Amber Manor Apartments Partnership* (1981), 95 Ill. App. 3d 541, 549, 420 N.E.2d 440, 446.

Plaintiffs contend that prior to the end of May of 1986 there

was "an agreement to extend an additional $500,000 line of credit under the same essential terms and conditions as an already established $350,000 line of credit" (count II) and that "as with the $500,000 line of credit, [the $120,000 loan] was based upon the same terms and conditions as the existing line of credit agreement" (count III). Among the terms and conditions of the 1985 loan agreement were the following:

> "Borrowers will maintain a working capital ratio of 1.5 to 1; on a consolidated basis."

And:

> "Borrowers will maintain a debt-to-equity rate of 3 to 1; on a consolidated basis."

Plaintiffs were not in compliance with either of these terms at the times they contend they reached, or at the times they planned to begin borrowing under, the two oral agreements with defendants.

The parties could not have intended new contracts with these two terms. It was obvious to all that immediately upon the formation of such contracts plaintiffs would have been in breach of these terms, and it is unreasonable to conclude that the parties would have intended to form contracts in which such breaches were inevitable and immediate occurrences.

It is undisputed that, with respect to the two purported oral contracts, the parties never agreed upon, or in any detail discussed, any specific modifications of the working capital and debt-to-equity ratios. If the numbers in the 1985 loan agreement are discarded, as they must be if there were two oral contracts as plaintiffs maintain, there is no basis on which to supply new working capital and debt-to-equity ratios for the new loans. If these were essential terms, then there were no oral contracts because of the failure of the parties to agree on essential terms.

In this case, the provisions requiring plaintiffs to maintain specified working capital and debt-to-equity ratios were essential terms. The 1985 loan agreement specified an interest rate of "1% before demand, maturity or default and 3% after demand, maturity or default above the prime rate of interest." Among the provisions of the 1985 loan agreement designed to insure that the loan's risk remained low enough to justify this rate of interest were the terms requiring plaintiffs to maintain their working capital and debt-to-equity ratios within specified limits. The loan would obviously be riskier if the working capital ratio was higher or the debt-to-equity ratio lower than specified. These terms concerning the financial condition of the borrowers were therefore sufficiently important to be essential to the oral contracts alleged.

■ Plaintiffs argue that "the evidence established that the Bank either did not deem these loan covenants material and/or waived compliance by Delcon." The 1985 loan agreement provided:

> "This letter represents the entire agreement between the parties and may not be modified or any provision waived in any manner except in writing."

Plaintiffs' contentions to the contrary notwithstanding, the only manner in which terms of the 1985 loan agreement could be waived was in writing. The only written waiver of the working capital and debt-to-equity ratio covenants was expressly limited to the period before and including March 31, 1986, and was not general as plaintiffs argue. Therefore, there was no waiver of the working capital and debt-to-equity ratio covenants that would support plaintiffs' claim that they were unnecessary to the oral contracts alleged.

Plaintiffs' contention that the two covenants were not important to the Bank is based upon (1) the limited waiver; (2) the Bank's advancing $20,000 on June 2 and $16,720 on June 19 after plaintiffs were in breach of the covenants; and (3) statements by Zaring "that he was not concerned with the loan covenant ratios because of the 'cyclical nature of the business' and the fact that Delcon's ability to conform to the ratios was severely affected when the Bank lent Delcon $310,000 to purchase a building for its corporate headquarters." We first note that plaintiffs have ignored the difficulty they had obtaining the limited waiver—the Bank did not initially give plaintiffs the waiver, but only did so after being told that failure to do so would result in plaintiffs' auditor issuing a "going concern letter" with likely disastrous impact on the plaintiff corporations. In any event, none of the facts noted by plaintiffs comes anywhere near establishing that the Bank intended to enter into contracts lending up to $500,000 more and $120,000 more to plaintiffs with no covenants whatsoever regarding plaintiffs' working capital and debt-to-equity ratios. We must conclude then that covenants as to these ratios were essential terms of the oral contracts alleged; that the parties never agreed as to these essential terms; and that they therefore did not form the oral contracts alleged.

■ There is an additional reason for finding that plaintiffs failed, as a matter of law, to establish the formation of the oral contracts. The 1985 loan agreement loaned plaintiffs a maximum of $350,000: (a) "Up to 80%, but no more than $300,000.00 of eligible receivables" which was referred to as "the 'Line of Credit Loan' " and (b) "[u]p to 80%, but no more than $50,000.00, of the purchase price of machinery and equipment hereafter purchased by Borrowers (hereinafter the 'Term Loan')." The alleged oral contracts were indefinite with respect to

which of these maximums applied and, if the line of credit loan maximum applied, how it was to be applied.

The alleged $120,000 oral loan contract was for equipment, seemingly placing it in the term loan provision. Yet, it was referred to not only as equipment financing but also as a "$120,000 line of credit," making it indefinite which of the 1985 loan agreement's provisions for computing the maximum amount of the loan applied.

With respect to the alleged $500,000 oral loan contract which was for a line of credit, and the alleged $120,000 oral loan contract if it too was for a line of credit, the parties do not seem to have agreed on how the line of credit loan provision of the 1985 loan agreement was to apply. In other words, they did not agree on whether the $500,000 (or $120,000) line of credit was to be entirely separate from the $300,000 line of credit under the 1985 loan agreement or was to be added to the $300,000 to make one $800,000 (or $420,000) line of credit.

The reason this makes a difference is that the terms "$300,000 line of credit," "$500,000 line of credit," etc., are misleading. The $300,000 line of credit is more accurately described as a line of credit of 80% of eligible receivables to a maximum of $300,000. If the parties intended only to add $500,000 (or $120,000) to the $300,000 maximum, plaintiffs would still be restricted to borrowing no more than 80% of eligible receivables. However, it seems clear that plaintiffs, at least, did not intend to enter into such a contract since, as will be explained in discussing the alleged breach of the 1985 loan agreement, at the time they intended to start borrowing against the additional amounts, 80% of plaintiffs' eligible receivables did not even amount to $300,000. On the other hand, it seems unreasonable to assume the Bank would have intended to establish a separate line of credit of up to 80% of eligible receivables but no more than $500,000 (or $120,000) since this would have resulted in plaintiffs being able to borrow up to 160% of their eligible receivables (if the eligible receivables were $300,000 or less). The evidence tended to show that plaintiff Ginder did not believe that the parties had agreed to such a line of credit since he proposed in a May 6, 1986, letter to Zaring:

"[T]hat advances to be used for working capital of Kane be based upon a formula up to 40 or 50% of the trade receivables instead of the 80% formula used in the balance of the line."

The parties never agreed on a percentage of receivables to be used in determining the amount plaintiffs would be entitled to borrow under a new line of credit.

Thus, the purported contracts were indefinite as to which loan's (line of credit or term) maximum amounts applied to the $120,000 and

were indefinite as to the percentage of receivables to be used in computing the amount plaintiffs were entitled to borrow. These were essential terms of the alleged oral contracts, and their indefiniteness requires that we conclude that no oral contracts to lend money were ever formed.

Essential terms of the alleged oral contracts were never agreed upon so no oral contracts to lend additional money were ever formed. Defendants were therefore entitled to judgment on counts II and III of the complaint.

■ We turn next to the fifth issue, which concerns whether defendants were entitled, as a matter of law, to judgment on count VI of the complaint alleging their breach of the written 1985 loan agreement. The parties disagree over whether receivables from bonded work, on which a bonding company rather than the Bank had the first lien, were includable in the borrowing base which, under the loan agreement, was used to calculate the maximum amount of the $300,000 line of credit that Delcon could borrow. We need not decide whether or not the bonded receivables were includable in the borrowing base because, in either event, the Bank was not obliged by the agreement to make any further advances. The argument in plaintiffs' brief demonstrates why the verdict in their favor on count VI cannot stand.

Plaintiffs correctly note:

> "The jury was instructed that in Count VI Delcon claimed the Bank breached the November 13, 1985 lending Agreement *** by failing to advance further funds pursuant to this agreement after June 19, 1986."

Plaintiffs contend:

> "Zaring told Ginder, Williams, Landers and Haas [all officers and employees of the corporate plaintiffs] that the Bank would not accept borrowing base certificates [BBCs] unless they excluded bonded receivables. [Record citations.] After the June 3[, 1986,] meeting, Zaring directed Landers to exclude from the BBC all accounts receivable relating to bonded work. *** According to Zaring's directions, Landers modified the BBC ***. The impact of this change was to create a negative borrowing base and prevent further advances from being made to Delcon."

This last sentence of plaintiffs' is made without record citation and is plainly incorrect. As plaintiffs themselves go on to note in their brief:

> "Because of Zaring's demands, there were two (2) BBC's prepared for the May 30 [sic]. Px 43 & 44. Px 44 was prepared without exclusion of bonded accounts receivable and reflected a

negative borrowing base of $43,705. The BBC prepared at Zaring's direction, which excluded bonded receivables, reflected a negative borrowing base of $63,843. [Record citation.]"

Thus, even if bonded receivables were included in the borrowing base, plaintiffs were not entitled under the agreement to borrow any more against the line of credit on the basis of the May 30 borrowing base certificate.

Plaintiffs contend:

"Zaring did not receive the May 30 BBC's until after the June 3 meeting. As Landers testified, [he] had previously explained to Zaring on May 15, 1986, that Kane would bill over $400,000 dollars in June 1986. [Record citations.] The billings would clearly put the company in an extremely favorable financial position wherein there would be no negative borrowing base, but rather an extremely positive figure for June 1986. [Record citations.]

*** Even Zaring admitted that as of June 3 he knew that the billings and collections for the six (6) school district projects would eliminate any shortfalls in the BBC. [Record citation.]"

In other words, plaintiffs contend that the 1985 loan agreement required the Bank to make further advances, even if there was a negative borrowing base, if plaintiffs anticipated large amounts of billings in the near future for work not yet even performed. The 1985 loan agreement did not require the Bank to do this, stating instead that plaintiffs could borrow:

"Up to 80% but no more than $300,000 of eligible receivables *** as evidenced in borrowing base certificates provided at such time or times as [the Bank] shall require but in no event not [sic] less frequently than monthly."

Thus, the anticipated billings, which were indisputably not eligible receivables and so were not included in even plaintiffs' borrowing base certificate including bonded receivables, did not entitle plaintiffs to further advances under the 1985 loan agreement.

Plaintiffs also contend:

"[T]he Bank was not even aware of what they claimed to be a purported breach by Delcon until June 9, 1986 when it received the May borrowing base certificate. Prior to this time the Bank had already breached its prior agreement to extend it an additional $500,000 in financing for the summer projects."

This seems to relate to the breach of oral contract alleged in count II rather than count VI, since the information that plaintiffs had a negative borrowing base as evidenced by a May 30 borrowing base certificate received by the Bank on June 9 would certainly justify the Bank's

not making advances after June 19, the action alleged by plaintiffs to have breached the 1985 loan agreement.

As a matter of law, the Bank was not required to advance further funds under the 1985 loan agreement. Defendants were accordingly entitled to judgment on count VI.

■■■ The third issue raised by defendants concerns whether they were entitled to judgment on count I because, as a matter of law, plaintiffs failed to prove the elements of fraudulent misrepresentation. Our supreme court has stated:

> "As disclosed by decisions of this court, the elements of a cause of action for fraudulent misrepresentation (sometimes referred to as 'fraud and deceit' or 'deceit') are: (1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance. [Citations.] Furthermore, the reliance by the other party must be justified, *i.e.*, he must have had a right to rely. [Citations.]" (*Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286, 402 N.E.2d 599, 601.)

Defendants contend that plaintiffs failed to establish the first element of fraudulent misrepresentation because the statements alleged were promises concerning future performance and plaintiffs did not prove that they constituted a scheme to defraud; and plaintiffs failed to establish that they justifiably relied upon the alleged misrepresentations. Disposition of this issue requires only that we address whether the evidence established that plaintiffs justifiably relied upon the alleged misrepresentations, so we express no views on the other contentions of defendants on this issue.

With respect to whether reliance is justified:

> "The rule is well established that a party is not justified in relying on representations made when he has ample opportunity to ascertain the truth of the representations before he acts. When he is afforded the opportunity of knowing the truth of the representations he is chargeable with knowledge; and if he does not avail himself of the means of knowledge open to him he cannot be heard to say he was deceived by misrepresentations. [Citations.]" (*Schmidt v. Landfield* (1960), 20 Ill. 2d 89, 94, 169 N.E.2d 229, 232.)

(See also *Marino v. United Bank of Illinois, N.A.* (1985), 137 Ill. App. 3d 523, 527, 484 N.E.2d 935, 938.) All of the alleged misrepresentations were that the Bank had committed to, or agreed to, provide

defendants with the $500,000 line of credit or the $120,000 equipment financing. As noted previously, the parties in their negotiations regarding the purported oral contracts to make these loans never agreed on several essential terms. Agreement on these terms would have been necessary for the Bank to be contractually obligated under the purported oral contracts to make the loans. These were facts equally available to both parties. Under these circumstances, plaintiffs were not justified in relying on statements that the Bank had committed or agreed to lend them the money.

As a matter of law, any reliance of plaintiffs upon the alleged misrepresentations by defendants was not justified. Defendants were accordingly entitled to judgment on count I alleging fraudulent misrepresentation.

■■ ■ The fourth issue raised by defendants concerns whether they were entitled to judgment on count IV "because, as a matter of law, the Bank did not intentionally interfere with Delcon's contractual relations when it refused to lend money to Delcon." The elements of tortious interference with a contractual relationship are:

"(1) [T]he existence of a valid and enforceable contract between the plaintiff and a third party; (2) the defendant's awareness of the contractual relationship; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the third party caused by the defendant's wrongful conduct; and (5) damages resulting from the breach. [Citations.]" (*Certified Mechanical Contractors, Inc. v. Wight & Co.* (1987), 162 Ill. App. 3d 391, 398, 515 N.E.2d 1047, 1051-52.)

(*Scholwin v. Johnson* (1986), 147 Ill. App. 3d 598, 607-08, 498 N.E.2d 249, 255; *Belden Corp. v. Internorth, Inc.* (1980), 90 Ill. App. 3d 547, 551, 413 N.E.2d 98, 101.) We need not consider the strength of the evidence with respect to the other elements because the evidence on the question of whether defendants' conduct was unjustified so overwhelmingly favored defendants that no contrary verdict on count IV could ever stand.

As plaintiffs correctly note, count IV of their complaint alleged:

"[T]he Bank's intentional interference with Delcon's contracts with six school districts for asbestos removal by unjustifiably refusing to honor its commitment to lend an additional $500,000 on a line of credit and later $120,000 for the purchase of equipment."

As we have previously stated, the two purported oral agreements to lend the money lacked essential terms so defendants were not contrac-

tually bound by them and plaintiffs were not justified in any reliance they may have placed on misrepresentations with respect to the Bank's having committed to, or agreed to, make these loans. In short, there was no evidence to establish that the Bank was unjustified in refusing to lend plaintiffs "an additional $500,000 on a line of credit and later $120,000 for the purchase of equipment."

The evidence on whether defendants' conduct was unjustified so overwhelmingly favored defendants that no contrary verdict could ever stand. Defendants were accordingly entitled to judgment on count IV alleging intentional interference with contractual relations.

■■■ The sixth issue raised by defendants concerns whether they were entitled to judgment on count V alleging that they intentionally interfered with Delcon's prospective economic advantage by sending collection notices in a commercially unreasonable manner. The elements of the tort of interference with prospective economic advantage are (1) plaintiff's reasonable expectancy of entering into a valid business relationship; (2) defendant's knowledge of this expectancy; (3) intentional interference by defendant preventing the expectancy from ripening into a valid business relationship; and (4) damage to plaintiff as a result of the interference. (*Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradstreet, Inc.* (1973), 16 Ill. App. 3d 709, 713-14, 306 N.E.2d 549, 553, *rev'd in part on other grounds* (1975), 61 Ill. 2d 129, 334 N.E.2d 160; see also *Belden Corp. v. Internorth, Inc.* (1980), 90 Ill. App. 3d 547, 552, 413 N.E.2d 98, 101.) As the *Belden* court noted:

> "Unlike the right to receive the benefits of a contract, the right to engage in a business relationship is not absolute, and must be exercised with regard to the rights of others.
>
> *** An individual with a prospective business relationship has a mere expectancy of future economic gain; a party to a contract has a certain and enforceable expectation of receiving the benefits of the contract. When a business relationship affords the parties no enforceable expectations, but only the hope of continued benefits, the parties must allow for the rights of others. *** In sum, as the degree of enforceability of a business relationship decreases, the extent of permissible interference by an outsider increases." (*Belden Corp. v. Internorth, Inc.* (1980), 90 Ill. App. 3d 547, 552, 413 N.E.2d 98, 102.)

Plaintiffs contend that the Bank committed this tort when it "sent letters to at least 18 individuals and/or entities which stated that, in the Bank's view, the Delcon companies were in default under their borrowing and security agreements and made demand upon the individuals

and/or entities to make direct payment to the Bank of any amounts due from them to Delcon."

Before discussing this issue, it is important to note a few facts. The 1985 loan agreement, demand note, and security agreement gave the Bank a security interest in all of Delcon's assets, including its inventory and accounts receivable. (See *Delcon Group, Inc. v. Northern Trust Corp.* (1987), 159 Ill. App. 3d 275, 277-78, 512 N.E.2d 378, 380.) As this court stated in its opinion reversing the trial court's order granting Delcon's request for a preliminary injunction:

"Delcon does not dispute that it was in actual default by unilaterally stopping payments of amounts due to Northern Trust in August 1986. Moreover, Delcon was also in default because it was insolvent in August 1986." (*Delcon Group, Inc. v. Northern Trust Corp.* (1987), 159 Ill. App. 3d 275, 280, 512 N.E.2d 378, 381.)

On October 1, 1986, the Bank declared Delcon to be in default and accelerated payment on the loan. The complaint at bar was filed on October 8, 1986. Subsequent to the filing of the complaint, attorneys for the Bank went to Delcon's offices and reviewed documents. The Bank sent the collection notice letters on October 27, 1986.

■■ Most of the letters were sent to current account debtors of plaintiffs. As we said in our prior opinion:

"Under article 9 of the Uniform Commercial Code Northern Trust had a clear statutory right to collect the accounts receivable once there was a default by Delcon. (Ill. Rev. Stat. 1985, ch. 26, par. 9—502.) Both commercial necessity and common sense dictate that a secured party's right to collect its collateral should not be interfered with absent a showing that the secured party is violating the terms of the loan agreement. No such showing was made by Delcon." (*Delcon Group, Inc. v. Northern Trust Corp.* (1987), 159 Ill. App. 3d 275, 279, 512 N.E.2d 378, 381.)

It makes no difference that some of these letters were to the six school districts for Kane's work on which the Bank had refused to lend Delcon money or that the Bank had subordinated its interest in these accounts receivable to the interest of the Harrison Construction Company. The Bank had a security interest in all of Delcon's accounts receivable and was not precluded from taking action to collect the accounts receivable for the six school districts merely because it did not hold the most senior security interest in them.

■■ Also, it was not commercially unreasonable for the Bank to send letters to debtors owing Delcon about $577,000 when Delcon only

owed the Bank about $270,000. It was possible that some of the debtors of Delcon would repay all or part of their debts before receiving the Bank's letter; that some of the accounts receivable would prove uncollectible; and that, at least on the accounts receivable of the six school districts on which Harrison Construction Company held the senior security interest, the Bank might receive only a fraction of the total amount owed Delcon due to the subordinated position of the Bank's security interest. This result is certainly within the contemplation of the Uniform Commercial Code, which provides that "[i]f the security agreement secures an indebtedness, the secured party must account to the debtor for any surplus." Ill. Rev. Stat. 1987, ch. 26, par. 9—502(2).

■■ Three or four of the letters were sent to nondebtors of Delcon. Two were to former account debtors of Delcon, the Chicago Public Schools and the City of Geneva. A third went to the architect and disbursing agent of an account debtor of Delcon, Balluff & Balluff. Ginder testified, though unlike the others to whom letters were allegedly sent no copy of the letter was introduced in evidence, that another letter was received by Harrison Construction Company, which had provided financing for the six school district projects. It is unnecessary to decide whether these three or four letters were sent in a commercially reasonable manner because there was no evidence that they prevented any expectancy of plaintiffs' from ripening into a valid business relationship or that they caused damage to plaintiffs.

Plaintiffs argue in their brief:

> "Ginder testified that as a result [of the Bank's sending the letters], the Delcon Companies were turned down on projects in which they were low bidder, including, but not limited to, the Downers Grove School District."

The general testimony that Delcon was turned down on projects because of the letters is too vague to support the cause of action. Moreover, with respect to this testimony in both its general and specific aspects, Ginder also testified:

> "*They* knew about our problem, *had received letters from the Downers Grove District 99.* For example, although it was not in here, they share the same facilities that Downers Grove 66 does as far as their superintendent of schools. They knew we had financial problems, the architect knew we had financial problems because of the letters that were sent out, and they passed and went on to the second bidder." (Emphasis added.)

From this testimony it would appear that Delcon's trouble getting contracts when it was the lowest bidder were caused by the Bank's letter to the Downer's Grove School District. That, however, was one of the

letters it was clearly proper to send, as it went to a current account debtor of Delcon, and was not one of the three or four letters we are now considering.

Plaintiffs continue in their brief:

"[T]he letters caused all cash flow to the Delcon companies to stop and as a result, they were unable to meet their obligations as they came due. In addition, they lost interest relating to the funds they were unable to collect and had to borrow additional funds to make up the difference during this time period."

Reference to Ginder's testimony confirms that the consequences plaintiffs here describe resulted from the receipt of the Bank's letters by plaintiffs' current account debtors, and not the receipt of the three or four letters now being considered.

Plaintiffs end their description of the results of the letters with:

"According to Ginder, Delcon had done over $175,000 of business for the first five (5) months of 1987, wherein during the same period for the prior year they had done $1,600,000. Ginder testified that the Bank's breach on its commitment and these letters were the cause of the damages sustained by Delcon."

But Ginder did not testify what, if any, damages were caused by the three or four letters now being considered apart from the Bank's proper actions of not lending plaintiffs additional money and of sending the 15 letters to current account debtors of Delcon.

Thus, 15 of the letters were clearly properly sent to current account debtors of Delcon and cannot provide the basis for an intentional interference with prospective economic advantage action. The evidence did not establish that the three or four other letters prevented any expectancy of plaintiffs' from ripening into a valid business relationship or that they caused any damage to plaintiffs. Defendants were accordingly entitled to judgment on count V.

The judgment of the circuit court is reversed, and judgment is entered in favor of defendants on all counts of the complaint. 107 Ill. 2d R. 366(a)(5).

Reversed.

DUNN and McLAREN JJ., concur.