DELPHI INDUSTRIES,
INCORPORATED, Plaintiff–Appellant,

v.

STROH BREWERY COMPANY,
Defendant–Appellee.

No. 90–2793.

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1991.

Decided Oct. 9, 1991.

As Amended on Denial of Rehearing
Nov. 25, 1991.

Lowell E. Sachnoff (argued), Candace J. Fabri, Marshall M. Seeder, Sachnoff &

Weaver, Chicago, Ill., for plaintiff-appellant.

Gary Senner (argued), Philip A. O'Connell, Jr., Robert A. Perkins, Sonnenschein, Nath & Rosenthal, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, CUDAHY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Delphi Industries and City and Suburban Distributors (C & S) shared a close relationship as corporations go. The Stroh Brewery Company allegedly terminated its contract with C & S over that distributor's choice (in Delphi) of corporate allies. But there was more at stake here than judging another by the company he keeps. Delphi brought suit against Stroh for intentional interference with both current and prospective contract rights. In this Illinois diversity case, the district court granted summary judgment for Stroh, from which Delphi appeals. We believe that the determination below was in part premature, and so we reverse and remand a number of claims for further proceedings and affirm others.

## I.

Delphi Industries, a liquor distributor in Chicago, enjoyed a long and prosperous relationship with the Schlitz Brewing Company, Stroh's predecessor. Delphi served as Schlitz' distributor in Chicago from the early 1960s until 1981. The relationship soured in 1982 when Delphi began an arbitration proceeding against Schlitz, claiming a breach of the wholesaler agreement. Delphi won the arbitration, but Schlitz in the meantime had been acquired by Stroh. Delphi and Stroh fought the award through the district court and the court of appeals. It was not until June 1986, animosities firmly established, that Stroh finally paid the award.

During that period, Stroh apparently adopted the position that it would have nothing more to do with Delphi or its principals, the Angelo Geocaris family. Unbeknownst to Stroh for some time, however, Delphi was acting as creditor, guarantor and landlord to C & S, Stroh's distributor in Chicago. C & S was indebted to Delphi for $1.3 million. Delphi also guaranteed two bank loans extended to C & S: Delphi was an obligor on a $200,000 loan from Gladstone–Norwood Trust and Savings Bank; and Delphi, C & S and American National Bank made a similar, if less formal, agreement for another loan—Delphi borrowed $750,000 from the bank and immediately lent the money to C & S, which in turn agreed to make payments on the loan directly to the bank. Delphi also rented a warehouse to C & S with the understanding that C & S would eventually purchase the facility. Neither the lease nor the purchase agreement were in writing, however.

Delphi understood Stroh's policy toward it, and so in 1985 it chose to restructure its loans to C & S to avoid the brewery's discovering their close connection. C & S signed new notes to its principals, C. Everett Wallace and Vito Bianco, for $845,000 and $455,000 respectively. Those two in turn executed notes to Delphi for the same amount. An unwritten understanding among all these parties was that the Wallace and Bianco loans from Delphi would be repaid only out of the cash flow received by Wallace and Bianco from C & S or the proceeds of its sale.

Despite this veil, by September 1986 Stroh, according to Delphi, knew about some or all of the distributors' ties. On September 11, the brewery took advantage of that knowledge. Stroh called several meetings between itself and C & S in early September, citing its belief that a change in control had occurred at C & S without honoring Stroh's contractually guaranteed right of approval. On September 11, it announced its conclusion that Angelo Geocaris (a principal of Delphi) had in fact assumed a role in C & S's management without consultation with Stroh. The brewery therefore terminated its wholesaler agreement with C & S. The result of this termination and the ensuing extended negotiations for C & S's liquidation (allegedly dragged out by Stroh's failure to approve a purchaser) was that the distributor was unable to continue making payments due on the Wallace and Bianco loans or on the bank loans. Moreover C & S ceased

paying rent at the warehouse and never purchased it.

Delphi filed this lawsuit in December 1988, alleging that Stroh tortiously interfered with its loans to Wallace and Bianco, its role as a guarantor on the Gladstone–Norwood loan and its warehouse lease with C & S. Count I of its amended complaint challenged each of the above obstructions as interference with contractual relations, while Count II described the same as interference with business expectancy. Count II added two more incidents of alleged interference with business expectancies, the disruption of the American National loan guaranty and the warehouse purchase agreement.

After discovery was complete, Stroh moved for summary judgment, which the district court granted. In its order granting summary judgment, the court first addressed Count II, intentional interference with business expectancy, or prospective economic advantage.[1] It found that each of the transactions described in Count II was an existing contractual relation and therefore not properly the subject of an action for interference with prospective economic advantage. It focused the remainder of its order on the Count I interference with contractual relations allegations. With respect to the Gladstone–Norwood loan, the court reasoned that because the loans were meant only to be paid from C & S's cash flow and the proceeds of a sale of the company's assets, the executives' failure to pay was not a breach of that contract since cash flow or proceeds of sale were nonexistent. Because interference with contract requires a breach, and there was no breach of the loan agreements, the court found against Delphi on this claim. With respect to the bank loans, the court found no probative evidence supporting Delphi's claim that Stroh knew of the distributor's guaranty. Turning last to the warehouse lease, the court reasoned that because the lease was not in writing, it violated the statute of frauds, and therefore was not enforceable. As such, it could not be the subject of plaintiff's tortious interference suit. Plaintiff has appealed most of the district court's rulings which underlay its grant of summary judgment for Stroh.

## II.

Our summary of the facts has resolved any reasonable inferences in favor of the plaintiff, who is, of course the nonmovant. *New Burnham Prairie Homes, Inc. v. Burnham,* 910 F.2d 1474, 1477 (7th Cir. 1990). Our review of Illinois law applied in this case is *de novo. Salve Regina College v. Russell,* —— U.S. ——, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). We find it more convenient to address plaintiff's appeal by transaction rather than by theory of relief.

*A. Delphi's Loans to Wallace and Bianco*

■ The loans to Wallace and Bianco were recorded by written instruments specifying principal and interest to be paid on certain dates. App. to Plaintiff's Mem. of Law in Response to Defendant's Motion for Summary Judgment, Vol. II, tabs 4 & 5 (Bianco note and security agreement); *id.,* tabs 6 & 7 (Wallace note and security agreement). Nevertheless, the district court found that the executives' failure to pay the required amounts on the assigned dates did not constitute a breach because there was no cash flow or proceeds out of which to make payment. Because any cause of action for interference with contractual relations requires that the interference cause a breach, *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill.2d 145, 154–55, 137 Ill.Dec. 19, 23, 545 N.E.2d 672, 676 (1989), the district

---

1. Illinois courts have variously designated this tort interference with prospective economic advantage, *Fellhauer v. City of Geneva,* 142 Ill.2d 495, 154 Ill.Dec. 649, 568 N.E.2d 870 (1991), interference with prospective business relationships, *Kruger v. Menard Elec. Cooperative,* 169 Ill.App.3d 861, 119 Ill.Dec. 952, 523 N.E.2d 708 (1988), and interference with prospective business expectancies, *Downers Grove Volkswagen,*

*Inc. v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 137 Ill.Dec. 409, 546 N.E.2d 33 (1989). The Restatement uses the term interference with prospective contractual relation. 4 *Restatement (Second) of Torts* § 766B (1979). We will refer to the tort as prospective economic advantage, the name most recently used by the Illinois Supreme Court.

court found no interference with the Wallace and Bianco loans.

■ But this conclusion misunderstands the import of the parties' oral agreement that the loans be paid from the specified sources only. The agreement simply set out the company's profits and sale value as the only source and collateral to which the creditor could look for repayment in the event of default. Thus the limitation in effect made the Wallace and Bianco loans "nonrecourse." *Black's Law Dictionary* at 953 (5th ed. 1979) (nonrecourse loan is "[t]ype of security loan which bars the lender from action against the borrower if the security value falls below the amount required to repay the loan"). Illinois cases have recognized numerous examples of such "profits and asset value" nonrecourse loans. *See, e.g., C.O. Funk & Sons, Inc. v. Sullivan Equip., Inc.*, 89 Ill.2d 27, 29, 59 Ill.Dec. 85, 86, 431 N.E.2d 370, 371 (1982); *Delcon Group, Inc. v. Northern Trust Corp.*, 187 Ill.App.3d 635, 640, 135 Ill.Dec. 212, 215, 543 N.E.2d 595, 598 (1989) (security in accounts receivable). Of course the fact that these loans were nonrecourse notes with limited security does not mean that they cannot be breached. Illinois recognizes that nonrecourse loans may be breached, *Lyons Sav. and Loan Ass'n v. Gash Assocs.*, 189 Ill.App.3d 684, 136 Ill. Dec. 888, 545 N.E.2d 412 (1989), and apparently Stroh concedes this point. Appellee's Br. at 26 n. 18.

The only issue here between Wallace and Bianco and Delphi is what assets Delphi may reach. The nonrecourse provision serves to protect the non-C & S-related funds of Wallace and Bianco from being reached. Stroh claims that the nonrecourse provision should also protect it (Stroh) against liability for inducing the breach. Stroh cites no authority supporting its contention, nor do we see any good reason for such a rule. A third party (like Stroh) that intentionally induces one party (Wallace or Bianco) to breach his contract so as to injure the nonbreaching party (Delphi) cannot benefit from the fact that the contracting parties limited the security to which either could look upon default. *Cf. Restatement (Second) of Torts* § 766 comment f (1979) (defenses of breaching party to action on the breach do not bar action against third party for intentional interference).

In the case before us, Wallace and Bianco were scheduled to make specified payments to Delphi on the notes on specific dates. Bianco note at 1, App. to Plaintiff's Mem. of Law in Response to Defendant's Motion for Summary Judgment, Vol. II, tab 4, at 1 (calling for twenty quarterly installments and a lump-sum final installment); Wallace note at 1, *id.*, tab 6, at 1 (same). Their failure to do so was a breach of the loan agreements, giving Delphi the right to proceed against the security. Regardless of Delphi's lack of success in recovering from Wallace and Bianco by seizing the security, Delphi can in any event recover from Stroh if it proves that Stroh intentionally brought about the breach. The nonrecourse nature of the notes is immaterial.[2] Therefore, summary judgment with respect to the loan in question must be reversed and the matter remanded.

■ The district court also found that any interference by Stroh with the Wallace and Bianco loans was not an interference with prospective economic advantage. Although this conclusion rests on somewhat technical grounds, we can accept it. An action for prospective economic advantage cannot be maintained upon the breach of an existing contract. *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 511, 154 Ill.Dec. 649, 657, 568 N.E.2d 870, 878 (1991); 4 *Restatement (Second) of Torts* § 766B comment a (1979) ("This Section is concerned only with intentional interference with prospective contractual relations, not yet reduced to contract."). The Wallace and Bianco loans were firm contracts and

---

2. In fact, the argument could be made that an inducement to breach a nonrecourse loan is more appropriately the subject of an interference with contract suit than if the loan had no nonrecourse features. When the debtor has a weaker incentive to fulfill the contract, the task of the breach-inducer is made that much easier. A party to a nonrecourse obligation assumes a greater risk that the other party will breach, but does not, in our view, intend to assume a greater risk that a third party will intentionally interfere.

are therefore not a basis of liability under Count II.

## B. Delphi's Guaranty of the Bank Loans

■ Delphi acted as a guarantor of two bank loans to C & S. In Count II, it claimed that Stroh interfered with its prospective economic advantage in causing C & S to stop making payments on those loans. Regardless whether Stroh did intentionally interfere with C & S's repayments, the guaranties must be merely prospective if Count II is to succeed. But the loans themselves represent existing agreements among Delphi, C & S and the banks. Delphi has offered us no reason to treat its guaranty of those loans differently than the loans themselves. The company's sole contention appears to be that C & S's ongoing payments to the banks make these loans continuing business expectations of Delphi. "Delphi's economic expectancies arose out of the business prospects of C & S.... All of these loans were to be and were being repaid out of the successful operations of C & S...." Appellant's Br. at 30. This argument overstates the breadth of the tort of interference with prospective economic advantage, which does not allow recovery for breach of the continuing performance of an existing contract. We therefore agree with the district court that the bank loans were existing agreements, to which only Count I is applicable.

■ In Count I, Delphi also brought a claim for intentional interference with contract on its guaranty of the Gladstone–Norwood loan. The district court found, however, that Delphi made no adequate showing that Stroh *knew* of its role as obligor on this loan. Without that knowledge, Stroh could hardly have *intentionally* interfered with the loan guaranty. Even reviewing that question *de novo* and drawing all inferences in Delphi's favor, we must agree with the district court's conclusion. The only evidence submitted by Delphi to show Stroh's knowledge of its guaranty was the deposition testimony of Bianco, one of C & S's executives. Unfortu-

nately for Delphi, that testimony falls short of the proof required.

Bianco's testimony about Stroh's knowledge was hedged from the start. "I can't say positively that [Stroh] knew about these specific financial transactions, okay? I believe they knew about the Gladstone [loan]." Bianco Dep. at 76. When pressed for the basis of his belief, the executive responded that he thought C & S had submitted the information in one of its financial statements. *Id.* But Bianco could not even recall how the loans would have appeared on those statements. Delphi has apparently never produced the financial statements to which Bianco refers. Delphi's reliance on Bianco's "experience as a long-time executive officer of C & S and his knowledge of the financial condition and the financial structure of C & S" is insufficient help to establish knowledge. Here, of course, we are concerned with Stroh's knowledge at the time it terminated C & S, not with C & S's knowledge.

Delphi also raises the argument here that we must permit the matter to go to trial on the *inference* that Stroh knew about the Gladstone–Norwood loan. Appellant's Br. at 24–25. Stroh should have known that the financially troubled C & S could not have acquired the loan without a guarantor. Only reasonable inferences need be drawn in the nonmoving party's favor on summary judgment. *Schlifke v. Seafirst Corp.*, 866 F.2d 935 (7th Cir.1989). This seems to be a very close question. The matter might be "inferred" or it might be speculation. Stroh might have inferred that there was a guaranty, but this is not proof that it did. Without additional proof of knowledge the evidence is not sufficient for trial and we would therefore affirm the judgment of the district court with respect to this transaction.

## C. The Warehouse Lease and Purchase Agreement

Delphi brought both types of intentional interference actions against Stroh for Stroh's alleged interference with the warehouse lease, but only claimed interference with prospective economic advantage with respect to the alleged purchase agreement. On appeal Stroh contests only the district court's rulings regarding interference with

prospective economic advantage. Before beginning our analysis of those claims, we must set out one assumption. The district court believed that a contract which would be unenforceable under the statute of frauds could not be the subject of a suit for intentional interference with contract. Mem. Op. and Order at 11, 1990 WL 106554 (July 10, 1990). Neither party disputes this ruling on appeal. Therefore, we do not reach the question and merely assume that the district court's ruling was correct.[3]

■ Although Delphi claimed that the alleged warehouse lease ran for five years, discovery revealed that the lease was an oral one. Thus the district court found that the lease would be unenforceable between the two parties due to the statute of frauds. *Daehler v. Oggoian*, 72 Ill.App.3d 360, 366, 28 Ill.Dec. 250, 255, 390 N.E.2d 417, 422 (1979). Notwithstanding the contract's unenforceability (or, more accurately, because of it), Delphi could bring its action on the lease for intentional interference with prospective economic advantage.

The fact that the enforcement of the oral lease itself was barred by the statute of frauds does not leave C & S's possession of the warehouse without legal basis. In Illinois a tenancy based on a lease that is barred by the statute of frauds becomes one from month to month. *See Marr v. Ray*, 151 Ill. 340, 37 N.E. 1029 (1894); *South Austin Realty Ass'n v. Sombright*, 47 Ill.App.3d 89, 93, 5 Ill.Dec. 472, 475, 361 N.E.2d 795, 798 (1977). Thus the relevant question is whether Stroh's interference with a month-to-month tenancy raises the possibility of tortious interference with a prospective economic advantage. Illinois law would suggest it does.

The Illinois Supreme Court recently addressed the tort of interference with prospective economic advantage. The plaintiff in *Fellhauer v. City of Geneva*, 142 Ill.2d 495, 154 Ill.Dec. 649, 568 N.E.2d 870 (1991) was terminated by the mayor from his at-will employment. The court initially noted that an at-will employee has no contract right to employment, and therefore has no right of action for tortious interference with contract. It went on to consider the question of interference with prospective economic advantage. "This court ... has long recognized a legitimate expectancy in an employment relationship. 'Where the contract is one of employment, it is immaterial whether it is for a fixed period or is one which is terminable by either party at will, both parties being willing and desiring to continue the employment under that contract for an indefinite period.' *London Guarantee & Accident Co. v. Horn* (1903), 206 Ill. 493, 507 [69 N.E. 526]." *Id.* at 512, 154 Ill.Dec. at 657, 568 N.E.2d at 878.[4]

Although the *Fellhauer* court went on to reject the tortious interference claim for other reasons, *id.* at 513, 154 Ill.Dec. at 657–58, 568 N.E.2d at 878–79, we find its reasoning requires reversal of the summary judgment on this claim. The district court believed that the lease constituted "an existing business relationship, not a prospective business relationship," Mem. Op. and Order at 4, and was therefore not

---

**3.** In support of its ruling, the district court cited three cases, each of which set out the elements of a prima facie case of intentional interference with contract. Moreover, it is true that, for a prima facie case of tortious interference, Illinois cases require "a valid, enforceable contract." *See, e.g., HPI Health Care Services*, 131 Ill.2d at 154, 137 Ill.Dec. at 23, 545 N.E.2d at 676. But the question at issue is whether a nonparty to the contract can invoke the statute of frauds (otherwise only a defense to an action for enforcement of the contract) as a defense in a suit for tortious interference with contract. The majority of courts to reach this issue have held that a contract can be subject to a suit for tortious interference despite a possible problem under the statute of frauds. *See, e.g., Friedman v. Jackson*, 266 Cal.App.2d 517, 72 Cal.Rptr. 129 (1968); *United Yacht Brokers, Inc. v. Gillespie*, 377 So.2d 668, 672 (Fla.1979) (citing W. Prosser, *Handbook of the Law of Torts* § 129, at 932 (4th

ed. 1971)); *Royal Realty Co. v. Levin*, 244 Minn. 288, 69 N.W.2d 667 (1955); *see generally* 96 A.L.R.3d 1294 § 4[a] (1979 & 1990 Supp.) (citing cases). The only case we have discovered from Illinois addressing tortious interference with an oral contract avoids the issue. *La Rocco v. Bakwin*, 108 Ill.App.3d 723, 64 Ill.Dec. 286, 439 N.E.2d 537 (1982), involved an oral lifetime employment agreement between a client and its attorney, but the court found that such agreements are void *ab initio* as a result of Illinois public policy that attorney-client relationships must remain at-will. *Id.* at 728, 64 Ill.Dec. at 290, 439 N.E.2d at 541.

**4.** The *Fellhauer* court clearly did not take the word "contract" in *London Guarantee* literally. It earlier noted that the plaintiff, Fellhauer, was an at-will employee at the time of his termination. 142 Ill.2d at 505, 154 Ill.Dec. at 654, 568 N.E.2d at 875.

subject to Count II. *Fellhauer*'s analysis refutes this conclusion. As a noncontractual month-to-month tenancy, the lease in this case generated the same expectancies as the noncontractual at-will employment agreement in *Fellhauer*. Like an at-will employment relationship, the lease could have been terminated at any time by either party. Nevertheless, Illinois would recognize the continuing business relationship, "both parties being willing and desiring to continue the employment under that contract for an indefinite period." Until one or the other party freely terminated the lease, it was a prospective economic advantage to Delphi.

*Fellhauer* does not require reversal of the district court's decision concerning the alleged oral agreement to purchase the warehouse. In its order of summary judgment the district court states specifically that an agreement existed between Delphi and C & S for the purchase of the warehouse. An existing agreement precludes an action for intentional interference with prospective economic advantage. Delphi could not argue that no agreement existed. Its own chief witness, Angelo Geocaris, testified that an agreement for the purchase had been reached. Geocaris Dep. at 345–46. Nor does Delphi appear interested in making that argument: its brief before us supports the finding of an agreement. Appellant's Br. at 7–8 ("C & S had agreed and had intended to purchase the warehouse from Delphi at some point in the future"). It might nevertheless have argued, consonant with the district court's legal analysis of the lease, that the oral agreement for the purchase of real property violates the statute of frauds. As such the agreement might have no effect, making the purchase of the warehouse still only a prospective economic advantage.

Delphi does not take this position. Instead, having never disputed the district court's finding that a purchase agreement existed, it states merely that "Delphi clearly had [a] legitimate economic expectanc[y] of the ... ultimate purchase of the warehouse being leased by C & S." Appellant's Br. at 30. This argument, like Delphi's argument regarding the bank loans, indicates an understanding that an existing agreement can also give rise to separate potential economic advantage gained from the agreement's performance. Illinois law allows no such conclusion.

### III.

The summary judgment with respect to Delphi's claim for intentional interference with its contracts for the Gladstone–Norwood loan guaranty and for the warehouse lease is AFFIRMED. The summary judgment with respect to intentional interference with Delphi's contracts for the Wallace and Bianco loans is REVERSED AND REMANDED. The summary judgment with respect to intentional interference with the prospective economic advantage in Delphi's loans to Wallace and Bianco, in the bank loan guaranties and in the warehouse purchase agreement is AFFIRMED. The summary judgment with respect to the claim for prospective economic advantage in Delphi's warehouse lease is REVERSED AND REMANDED.