**PACE COMMUNICATIONS, INCORPORATED, Plaintiff–Appellee,**

v.

**MOONLIGHT DESIGN, INCORPORATED, Defendant–Appellant.**

No. 93–2690.

United States Court of Appeals, Seventh Circuit.

Argued April 4, 1994.

Decided Aug. 11, 1994.

Merle L. Royce, Donald A. Mackay (argued), Chicago, IL, for plaintiff-appellee.

Casandra E. Melton (argued), Robert H. Anderson, Chicago, IL, for defendant-appellant.

Before CUDAHY, EASTERBROOK and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

Moonlight Design, Inc. imports and sells bridal gowns. It sought to advertise its gowns in Elegant Bride, a bimonthly bridal magazine owned by Pace Communications, Inc. Moonlight Design promised to take out 24 pages of advertising in Elegant Bride over a one-year period, but backed out on five of those pages. It also breached two additional agreements to purchase advertising. Pace sued, and after a bench trial the district court awarded Pace a judgment of just over $50,000. Moonlight appeals.

## I

Elegant Bride's target audience is made up largely of prospective brides. The magazine changed its name in the fall of 1990 from Southern Bride in an attempt to expand its circulation and reach a national audience. Even so, the magazine, which (like most bridal magazines) is sold almost exclusively at newsstands, ranks last in circulation among the four national bridal magazines, trailing Bride's and Your New Home, Modern Bride and Bridal Guide.

Elegant Bride began negotiating an advertising package with Moonlight in October 1990, and by January 1991 the parties were nearing agreement. On January 10, 1991, Chris Deluca, Pace's advertising salesperson, sent Hugh Chin, president of Moonlight, a facsimile copy of Elegant Bride's standard Insertion Order/Contract for Advertising form. Deluca had filled in the form, apparently according to the agreement the parties had ironed out. The form indicated that Moonlight would purchase a total of 24 pages of four-color advertising over six consecutive issues of Elegant Bride: 4 pages in April/May 1991, 2 pages in June/July 1991, 4 pages in August/September 1991, 4 pages in October/November 1991, 2 pages in December/January 1992 and 8 pages in February/March 1992. The total price for the 24 pages was $94,076. This price represented an almost $15,000 discount from Elegant Bride's 1990 published rate,[1] which, for advertisers who already received a volume discount for agreeing to purchase 24 pages of advertising in a year, would have been $109,038 (the net price of $4,543.25 per page, times 24 pages).

The parties had also apparently agreed to a few miscellaneous terms not contained on the contract form. Elegant Bride, for instance, agreed to provide Moonlight with "editorial coverage" in the magazine, and to place a Moonlight gown on the cover of the August/September 1991 issue. Deluca therefore typed these additional terms onto the form, and faxed the document to Chin.

Upon receiving the fax, Chin apparently believed that some of the terms on which they had agreed were not included on the contract form. He therefore typed these additional terms onto the form, signed it, and faxed it back to Deluca. The terms that Chin added provided that Elegant Bride would guaranty the magazine's circulation,

---

1. Because the contract negotiations began in 1990, the 1990 rates represented the starting point for the negotiations, despite the fact that advertisements purchased were to run in 1991 and 1992.

would include Moonlight in any "special promotions" over the duration of the contract, and would "improve in photography and covers." Neither Deluca nor anyone else at Pace ever signed the form with Chin's additions. Rather, Deluca sent Chin a fax indicating that Pace was "extremely pleased that you have decided to join our list of advertisers." No mention was ever made of the additional terms.

One of the standard provisions on the contract form also proves important. Paragraph 10 of the form notes that cancellation of space reservations "will result in an adjustment of the rate (short rate) based on past and subsequent insertions to reflect actual space used at the earned frequency or volume rate." There is no dispute about the general meaning of this language: where an advertiser contracts to purchase a certain number of pages of advertising (and receives a volume discount), but ends up purchasing fewer pages of advertising than promised, the advertiser is required to pay the per page rate that would apply to a contract for the number of pages actually purchased.

This "short rating" provision is made necessary by Elegant Bride's sliding scale of volume discounts. For example, Elegant Bride's 1991 rate card indicated that the base price for a full-page 4–color advertisement was $8,781. But discounts were offered for volume advertisers; the price per page fell to $8,342 for advertisers who purchased three pages in a year, $7,903 for six pages, $7,465 for twelve pages, and so on.

So, using the 1991 rates, if an advertiser was quoted $7,465 per page after promising to take out twelve pages over a year, and then purchased only ten pages, the advertiser would be required to pay $7,903 per page—the applicable volume discount for an advertiser who purchases between six and eleven pages over a year. This short-rating provision, which essentially stands for the reasonable proposition that an advertiser receives a volume discount based on the number of pages it actually purchases, not the number of pages it says it will buy, turned out to have fairly harsh implications for Moonlight.

Moonlight canceled two of the four pages it had agreed to purchase in the October/November 1991 issue, and three of the eight pages in the February/March 1992 issue. While the parties reached an oral agreement to make up the five re-scheduled pages in the April/May 1992 issue, Moonlight ultimately refused to do so. This decision proved very expensive. The contract form says that "insertion orders are accepted subject to provisions of our current rate card." Elegant Bride therefore "short-rated" Moonlight based on its 1991 rate card. Having to pay for the 19 pages of advertising based on the 1991 rates meant losing the volume discount it had achieved by agreeing to purchase 24 pages, and more importantly meant losing the $15,000 discount it had negotiated off of the published rates. Elegant Bride therefore billed Moonlight for 19 pages at $5,970.40 per page (which was the 1991 published rate, net of the 15 percent discount), which came to $113,437.60. Moonlight had already paid $75,099.75 toward this contract, so Elegant Bride invoiced Moonlight for the balance—$38,337.85. Had Moonlight gone ahead and taken out the five additional pages, the total bill would have been limited to the contract price, $94,076.

When Moonlight refused to pay, Elegant Bride brought suit for the balance indicated, plus an additional $11,781 for Moonlight's breach of separate advertising contracts. Moonlight's liability on those claims is not in dispute. Because the parties are of diverse citizenship, the district court's jurisdiction was premised on 28 U.S.C. § 1332. Following trial, the district court entered judgment for Elegant Bride "in the amount of $50,-118.85 plus interest and costs."

II

A

We confront at the outset two jurisdictional questions. The first regards whether the district court has entered a final judgment, which is necessary to trigger appellate jurisdiction. 28 U.S.C. § 1291. The final paragraph of the court's opinion, indicating that it is entering final judgment for Pace

Communications for $50,118.85, "plus interest and costs," is a bit perplexing.

■ Civil litigants who win money judgments in district courts are entitled to *post* judgment interest. This much is guaranteed them by statute, 28 U.S.C. § 1961(a). Expressly awarding such interest as part of the judgment is redundant. And saying that litigants get interest, without specifying whether it is prejudgment or postjudgment, creates confusion.

■ This is so because where a court intends to award *pre* judgment interest, its judgment is not final (and therefore not appealable) until the amount of interest is calculated. While a motion for an award of costs is collateral to the merits, *Buchanan v. Stanships, Inc.*, 485 U.S. 265, 108 S.Ct. 1130, 99 L.Ed.2d 289 (1988), and the merits therefore separately appealable, *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988), *pre* judgment interest is different. It is part of the plaintiff's complete compensation, *West Virginia v. United States*, 479 U.S. 305, 310 n. 2, 107 S.Ct. 702, 706 n. 2, 93 L.Ed.2d 639 (1987), part of the merits of the underlying action.

A motion for prejudgment interest is therefore a Rule 59(e) motion to amend a judgment, *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989). A court that has decided to award prejudgment interest has not entered an appealable final judgment until that amount has been calculated. The district court here has not calculated an amount of prejudgment interest, so if its reference to "interest" means that it intends to do so, our jurisdiction has not yet ripened.

But Pace says that it never asked the court for prejudgment interest. While the complaint asks for "interest and costs," Pace's counsel told us at oral argument that it was *not* seeking *pre* judgment interest. We go along with Pace's interpretation, reading both the complaint and the district court's opinion to contain unnecessary references to *post* judgment interest. That conclusion renders the district court's judgment final, and secures our jurisdiction. We note, however, that postjudgment interest is awarded by automatic statutory provision. To expressly award postjudgment interest is superfluous. Worse yet, mentioning "interest" but failing to say anything more creates this jurisdictional muddle. By using more precise language, both litigants and district courts can (and should) chart a clearer course through such murky waters.

B

■ The second jurisdictional question comes by way of Moonlight's claim that the amount in controversy requirement was not satisfied, and that the district court therefore lacked diversity jurisdiction. Last increased in 1988, the amount-in-controversy requirement for diversity jurisdiction is $50,000. 28 U.S.C. § 1332.

Moonlight argues that in determining damages on the "short rate" claim, the court should have used the 1990 rates, not 1991. This argument is premised on the language in the contract suggesting that short rates are determined by looking to the provisions of "our current rate card." If "current" means "current at the time the contract is negotiated," then the 1990 rates would apply. But if "current" means "in effect for the time in which the advertisements were supposed to run," the 1991 (or 1992) rates would apply. Had the 1990 rates been applicable, Moonlight points out, the total award would be for less than $50,000. So it argues for the first interpretation of "current," and insists that the $50,000 jurisdictional amount has not been satisfied, stripping the district of subject-matter jurisdiction.

This contention is essentially frivolous. "The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938) (footnotes omitted).

Putting aside, for a moment, the merits of which year's rates should apply, there was

surely at least a good faith argument to be made (and one that the district court ultimately accepted) that the 1991 rates were applicable. There is no doubt that diversity jurisdiction was properly had.

## III

### A

■ This brings us to the merits. The district court here believed that the exchange of documents never quite matched up. Because this is a case governed by Illinois' common law rather than the Uniform Commercial Code, the court concluded, applying the common law "mirror image rule," that the exchange did not create a contractual relation between the parties. Compare *Northrop Corp. v. Litronic Industries*, 29 F.3d 1173 (7th Cir.1994) (discussing the related "battle of the forms" problem—and the notorious distinction between "different" and "additional" terms—under § 2–207 of the U.C.C.). But because both parties had shown "a mutual intention to contract," *e.g. Mowatt v. Chicago*, 292 Ill. 578, 127 N.E. 176 (1920), the court concluded that an implied contract was formed, and that its terms were those of Elegant Bride's initial offer. It seems to us that this "implied contract" theory is slightly off the mark.

The form that Elegant Bride faxed to Moonlight represented an offer. It is clear, and everyone here agrees, that when Moonlight added terms to the contract, signed it, and faxed it back, it rejected Elegant Bride's offer and made a counteroffer. It seems to us that by responding favorably, Moonlight accepted this counteroffer.

The district court disagreed, focusing on the terms that Moonlight added to the contract. In its view, "no mutual assent existed" because the additional terms, after being added to the contract by Moonlight, "were not thereafter discussed by the parties." Findings of Fact and Conclusions of Law (June 14, 1993) 12.

■ It is of course true that there needs to be mutual assent. But Elegant Bride's response to Moonlight's counteroffer: "We are extremely pleased that you have decided to join our list of advertisers," is surely a sufficient manifestation of intent to form a contract. There is no requirement that parties discuss a contract's every term in order to be bound by it—indeed, such a rule would reward parties for their failure to read what they sign, hardly an incentive that contract law would seek to create. The district court relied on a line from an Illinois appellate court opinion: "the failure of the parties to agree upon or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking," *Delcon Group v. Northern Trust Corp.*, 187 Ill.App.3d 635, 135 Ill.Dec. 212, 543 N.E.2d 595 (1989). But *Delcon Group* was discussing an *oral contract*, where the parties' discussions are the beginning and end of the analysis. We do not read *Delcon Group* to stand for the proposition that an exchange of documents does not give rise to a contractual relationship unless the parties discuss the contract's terms.

■ Some confusion is perhaps created by paragraph 12 of Elegant Bride's contract form, which provides that orders that "contain rates and/or conditions which vary from the rates and conditions listed herein shall not be binding on ELEGANT BRIDE (unless expressly approved in writing by the Publisher)." But when Moonlight added terms to the form, those terms became "rates and conditions listed herein," not rates that *varied* from the contract. This contractual language, in effect, simply reiterates the parol evidence rule. Oral modifications of the contract are not binding. It does not affect, however, the parties' ability to alter the written terms of the document itself.[2]

### B

■ But this turns out to be only a detail. In either case, Moonlight breached its agreement to take out 24 pages of advertising, and is liable for damages. The only argument

---

2. Because we conclude that the parties' exchange of documents gives rise to a written contract, we need not consider Moonlight's argument that the district court somehow violated Fed.R.Civ.P. 54(c) by relying on an implicit contract theory.

over the court's computation of the short rate is the claim that reference to Elegant Bride's "current rate card" meant the 1990 rates (in effect when the contract was negotiated) rather than the 1991 rates (or even the 1992 rates), which were in effect at the time of the breach. The district court here read this language as referring to the 1991 rates, which were in effect when Moonlight first told Elegant Bride that it was not going to take out all of the pages that it had promised to. Moonlight provides us with no reason to take issue with this interpretation. The district court correctly computed the short rate in this case.

## C

The only other possible objection to the damages calculation is the argument that the "short rate" provision is a penalty clause, and therefore unenforceable under Illinois law. Moonlight did not advance this argument before the district court, and did so on appeal only to suggest that the jurisdictional amount had not been satisfied. But as we have noted, because there is no suggestion that Elegant Bride's damages claim was not made in good faith, that argument goes nowhere.

█ But had this argument been made as a challenge to the validity of the short rate liquidated damages provision, it would raise an interesting question. We noted in *Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1289 (7th Cir.1985), that courts' traditional "refusal to enforce penalty clauses is (at best) paternalistic," but noted that "like every other state, Illinois, untroubled by academic skepticism of the wisdom of refusing to enforce penalty clauses against sophisticated promisors . . . continues steadfastly to insist on the distinction between penalties and liquidated damages." While our comments in *Lake River* have found their way into a leading contracts treatise, see E. Allan Farnsworth, *Contracts* (2d ed. 1990), § 12.18 n. 14, the case has never been cited by an Illinois court. Instead, the Illinois courts have adhered to the common law principle that unreasonably large liquidated damages provisions are unenforceable as penalty clauses. *E.g. Grossinger Motorcorp, Inc. v. American Nat'l Bank & Trust Co.*, 240 Ill. App.3d 737, 180 Ill.Dec. 824, 607 N.E.2d 1337 (1992). *See also* Restatement (Second) Contracts § 356(1).

The common law principle is that a liquidated damages provision is enforceable when it appears in advance that it would be difficult at the time of breach to compute actual damages and the liquidated damages provision is a good faith attempt to estimate what actual damages would be. It seems clear enough in this case that determining actual damages might be difficult. Where an advertiser backs out, the magazine can print fewer pages (which probably reduces the magazine's costs), or can try to resell the space. But if it re-sells the space, perhaps the new buyer is someone who would have advertised anyway, which would have permitted the magazine to print additional pages (increasing both its revenue and its expenses). All of these possibilities are riddled with variables, so figuring out actual damages in the event an advertiser breaches does look as if it might be a daunting task, permitting the parties to agree in advance to a liquidated damages provision.

But that provision must be a reasonable attempt to estimate actual damages. On the record before us, it is difficult to tell whether the "short rate" provision is such a reasonable effort. While on its face this language simply requires the advertiser to pay the published rates for the space it actually purchases, which seems reasonable enough, the fact that the Moonlight here loses the $15,000 discount that it had negotiated is problematic. In this case, the result is that Moonlight is forced to pay more for the 19 pages it purchased than it would have had it performed on the contract and purchased 24 pages. It is difficult to argue that this represents the parties' best estimate of "actual damages."

If we knew that Elegant Bride typically gives advertisers large discounts off of its published rates, actually charging those rates only to advertisers who breach their contracts, it would be fairly clear that this provision represented a "penalty." Matters might be more complicated if Moonlight's large discounts were exceptional, and advertisers typically had to pay the published rates. But

even in that case, having to give up an advantageous bargain in the event of breach, without regard to the actual damages suffered, might nonetheless be treated as a penalty clause under Illinois law.

But in any event, the argument that a liquidated damages provision (like the short rate clause) is unenforceable because it is a "penalty clause"—were it presented to the district court—would have been an affirmative defense to Pace's claim for damages under the clause. Moonlight would have therefore borne the burden of showing that the provision was not a reasonable effort to estimate what actual damages would be. Because it presented no such evidence, we need not decide whether such an argument would have succeeded, or even whether the argument is preserved for appeal.

D

Moonlight next suggests that other advertisements that it purchased in Elegant Bride, under separate contracts at lower per page costs, should count towards the 24–page promise in this contract. This argument stems from the contract language providing that "cancellation of space reservations ... by the advertiser will result in an adjustment of the rate (short rate) based on past and subsequent insertions to reflect actual space used at the earned frequency or volume rate." But as we read this language, it provides that Moonlight could have substituted the agreed-to advertisements for others within in the relevant time period. The oral modification of the contract (which Moonlight breached), permitting Moonlight to make up the five canceled pages in a subsequent issue is along these lines. But there is no reason to believe that other advertisements for which separate contracts exist should somehow be double-counted, satisfying Moonlight's obligations under both this and another contract. In sum, we find no error in the court's calculation of damages.

IV

Moonlight argues (correctly, we believe) that the district court did err in concluding that the parties formed a de facto (or im-

plied) contract under the terms of Pace's initial order, rather than a written contract under the terms of Moonlight's counteroffer. But this turns out to be of no consequence. Moonlight tells us that the case should "be remanded to determine the parties' rights and liabilities" under the contract. But even under the contract as Moonlight understands it, it has no remedy against Pace.

Moonlight's counteroffer contained three additional terms: (1) "stipulations of contract distribution must be garanteed (sic)"; (2) "inclusion: all special promotions that develope (sic) during the duration of the contract"; and (3) "Elegant Bride must improve in photography and covers." Moonlight does not have a claim against Pace for breach of those terms.

Though the district court erroneously concluded that the "distribution must be guaranteed" language was not part of the contract, the court also made a factual determination that Moonlight never requested from Elegant Bride any information regarding its circulation. As such, Moonlight presented no evidentiary basis for determining what the "guaranteed" level of circulation was, and whether that guaranteed level was achieved. The terms of a contract must "provide a basis for determining the existence of a breach and for giving an appropriate remedy." Restatement (Second) Contracts § 33(2). See also Academy Chicago Publishers v. Cheever, 144 Ill.2d 24, 161 Ill. Dec. 335, 578 N.E.2d 981 (1991). The "distribution must be guaranteed" term is thus too indefinite to enforce.

The second provision provided that Moonlight would be included in any special promotions. To that end, the district court found that Moonlight was offered inclusion in all special promotions. Findings of Fact and Conclusions of Law (June 14, 1993) 4. Pace therefore complied with this term. Finally, the claim that the photography and covers must "improve"—like the circulation guaranty without any evidence of circulation—is far too indefinite to be judicially

enforceable. The judgment of the district court is therefore AFFIRMED.