**GLS DEVELOPMENT, INC., Plaintiff,**

v.

**WAL–MART STORES, INC.,
et al., Defendants.**

**No. 94 C 6323.**

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 7, 1996.

Robert Towne Palmer, Chicago, IL, for Plaintiff.

Peter D. Sullivan, Kevin W. Bruning, Richard B. Polony, Hinshaw & Culbertson, Chicago, IL, for Wal–Mart Stores, Inc.

James T. Ryan, Neil M.B. Rowe, Ryan & Nelson, Arlington Heights, IL, for DiMucci Development Corporation.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

In its First Amended Complaint GLS Development, Inc. ("GLS") has sued both Wal–Mart Stores, Inc. ("Wal–Mart") (Count I) and DiMucci Development Corporation ("DiMucci") (Count II), charging each with breach of contract. This Court's May 30, 1996 memorandum opinion and order (the "Opinion," 1996 WL 296594) denied a motion by DiMucci for summary judgment under Fed.R.Civ.P. ("Rule") 56. Now Wal–Mart

has filed its own summary judgment motion. Both Wal–Mart and GLS have complied with this District Court's General Rule ("GR") 12(M) and 12(N),[1] and Wal–Mart's motion is fully briefed and ready for decision. For the reasons stated in this memorandum opinion and order, the motion is granted in part and denied in part.

### Summary Judgment Standards

Familiar Rule 56 principles impose on Wal–Mart the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to GLS (*Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991) and cases cited there). As with every summary judgment motion, this Court accepts nonmovant GLS' version of any disputed facts.

This Court has already set out the background facts underlying this lawsuit in some detail in the Opinion. Accordingly this opinion will outline only those facts necessary to the resolution of this Wal–Mart motion for summary judgment. What follows is a version of the material facts culled from the parties' submissions, with any differences being resolved in GLS' favor.

### Facts

In November 1992 Wal–Mart acquired an option to purchase some Cicero, Illinois real estate from an Illinois land trust, the beneficial interest of which was owned by William Pacella (the "Pacella option") (G. 12(N) ¶ 6). At that time Wal–Mart intended to "self-develop" the Cicero property (without the employment of an independent real estate developer) by tearing down an older existing Sam's Club and building both a new Sam's Club and Wal–Mart store (G. 12(N) ¶ 7). In January 1993 [2] the Town of Cicero ("Cicero") approved a Redevelopment Agreement with favorable financing terms, under which Wal–Mart was to develop the Cicero parcel (W. 12(M) R. ¶ 2). In March, however, Wal–Mart's Real Estate Committee rejected the proposed self-development (G. 12(N) ¶ 10).

In mid-March Kimberly ("Kim") Black ("Black," though now known as Kimberly Lane), a real estate manager for Wal–Mart, took over responsibility for development of the Cicero property. Black began negotiations with DiMucci's Director of Leasing and Commercial Development Richard Filler ("Filler") to have DiMucci develop the Cicero project. Under a proposed agreement between Wal–Mart and DiMucci, the latter would (1) acquire and exercise Wal–Mart's rights under the Pacella option, (2) build a new Sam's Club and (3) enter into a long-term lease with Wal–Mart for the new store. As of late June, however, Wal–Mart and DiMucci could not reach agreement as to an appropriate rental rate, and Wal–Mart decided to seek out GLS as an alternative developer (G. 12(N) ¶¶ 11–14).

On July 21 GLS' President Gary Schwab ("Schwab") submitted a written proposal to Wal–Mart for development of the Cicero property (Complaint Exhibit 1). GLS offered to accept an assignment of the Wal–Mart option to purchase the Cicero property, to demolish and remove the older Sam's Club, to build a new Sam's Club and to lease the new project to Wal–Mart for a 25–year term. GLS' July 21 offer was made expressly contingent on the successful negotiation of a number of collateral agreements, including

---

1. This District Court has designed GR 12 to facilitate the resolution of Rule 56 motions by highlighting the existence or nonexistence of factual disputes. GR 12(M) requires a Rule 56 movant to submit a statement of assertedly uncontested facts, with citations to the record in support of those facts. Then GR 12(N) requires the nonmoving party to respond point by point, with citations to the record in support of (1) any claimed disputes as to the movant's version of the facts and (2) any additional facts that the nonmovant chooses to assert. Wal–Mart's state-

ments will be cited "W. 12(M) ¶ —," with its responses to GLS's statement of supplemental facts being cited "W. 12(M) R. ¶ —." GLS' responses and statement of supplemental facts will respectively be cited "G. 12(N) ¶ —" and "G. 12(N) Supp. ¶ —."

2. Because all of the critical operative events from here on out also took place in 1993, this opinion's further references to dates will consistently omit the year designation.

an agreement between GLS and Cicero for tax increment financing for the development:

Our offer is contingent upon the following items which must be accomplished prior to September 2, 1993 ... (4) Execution of a T.I.F. agreement between the Town of Cicero and GLS which will provide for the sale of bonds within 90 days of closing which proceeds shall be distributed fully to GLS (Complaint Exhibit 1).

GLS' offer was approved by Wal–Mart's Executive Committee and then accepted by Wal–Mart in an August 2 letter from Black to Schwab. Although GLS had proposed that it would accept assignment of the Pacella option, instead Wal–Mart exercised the option itself and notified GLS in Black's August 2 letter that Wal–Mart had begun "preparing an Assignment Agreement of the above referenced Option assigning Wal–Mart's interest to GLS Development, Inc." (Complaint Exs. 1 and 2, Schwab Dep. 35–36). Under the Pacella option the property purchase had to be closed within 30 days after the option was exercised (W. 12(M) R. ¶ 7).

In early August, shortly after Wal–Mart and GLS had reached agreement, Wal–Mart's broker met with Cicero officials to explain that GLS would be developing the Cicero project (W. 12(M) R. ¶ 9). Before that meeting Cicero Town Attorney Dennis Both ("Both") had been working on a new redevelopment agreement with the understanding that the development would be done by DiMucci. In an August 5 letter to Wal–Mart's broker, Both expressed surprise that his "repeated warnings" to Wal–Mart that Cicero's redevelopment agreement not be "shopped" had been ignored, and insisted that Cicero "will no longer be taken for granted as a rubber stamp" (G. 12(N) Supp. ¶¶ 11–12, App. 11). Cicero officials refused to meet with GLS in August, and Schwab became convinced by late August that Cicero would not enter into a redevelopment agreement with GLS (W. 12(M) R. ¶ 13; G. 12(N) ¶ 21).

On August 24 Black spoke with Schwab by telephone to discuss the status of the Cicero Sam's Club development. Black asked that GLS "walk away" from the development because Cicero wanted DiMucci to develop the project. As compensation to GLS, Black offered that Wal–Mart would "make sure that you [GLS] are taken care of" to the tune of a $500,000 payment to GLS—the same amount that Wal–Mart had asked GLS to make to DiMucci when GLS had been awarded the development contract—and would give GLS "a few" additional projects to work on in lieu of the Cicero development (G. 12(N) ¶¶ 22–24; Schwab Dep. 11–18). Because that area of Schwab's testimony was obviously so critical to the current dispute, Wal–Mart's attorney interrogated him repeatedly and at length on that score—and Schwab consistently characterized the reference to the $500,000 payment in the same terms, including this statement of Black's promise (referring to the same $500,000 amount that Schwab testified GLS was to pay DiMucci when the GLS–DiMucci positions had been reversed) (Schwab Dep. 19):

She said whatever the amount was that's what you'll be paid.[3]

Schwab accepted those terms, and GLS withdrew from the project.

Between August 24 and August 27 Schwab became concerned about Black's agreement to do "a few" more developments with GLS, for her promise had eroded in subsequent conversations to doing only "a couple" more (G. 12(N) Supp. ¶ 26). On August 27 Schwab sent a letter to Black via facsimile, stating in part (G. 12(N) ¶ 26; Answer to Complaint Ex. A):

In consideration for stepping aside and the time and effort GLS Development, Inc. has put forth in trying to secure the development of the site, Wal–Mart Stores Inc. will

---

3. [Footnote by this Court] Although this opinion does not set out Wal–Mart's version of the facts, it should be observed that Wal–Mart's counsel is guilty of some overreaching in labeling Wal–Mart (meaning Black) as having *denied* Schwab's account (W. 12(M) ¶ 22; Wal–Mart Mem. 3, R. Mem. 3). In fact Black was careful to disclaim any such outright denial—her deposition testimony repeatedly spoke in terms of her not recalling having made the statements that Schwab ascribed to her (most specifically at Black Dep. 192, lines 1–8). Counsel should realize the importance of avoiding such overstatements in their factual presentations.

provide two (2) future site locations, either in Chicago proper or the suburbs of Chicago, for GLS Development, Inc. to develop. Schwab's letter did not include any reference to the $500,000 payment because Black had acknowledged that payment obligation on later occasions, and Schwab was not concerned about her honoring her commitment—she had told Schwab that her word should be good enough (G. 12(N) Supp. ¶¶ 27–28). In response to Schwab's letter, Black crossed out the words "provide two (2) future site locations" and replaced them with "use its best efforts to find another location." Black also added the phrase "should Wal–Mart continue the Chicago Metro program." Black then signed and returned the letter to Schwab via facsimile (G. 12(N) ¶ 27; Answer to Complaint Ex. 1).

On August 27 Black also signed on Wal–Mart's behalf a "Letter of Intent" agreement with DiMucci for the Cicero development. As part of that letter DiMucci agreed to pay $250,000 to GLS (G. 12(N) ¶ 29):

> At such time as the tax increment financing bonds to be issued by the City of Cicero in connection with our acquisition of the property are funded, we [DiMucci] agree to pay GLS Development, Inc. Two Hundred Fifty Thousand Dollars ($250,-000) as a cancellation fee for its existing agreement with you [Wal–Mart].

DiMucci's Filler has testified that Black urged DiMucci to pay GLS that amount so that GLS would withdraw and the Cicero development could go forward (W. 12(M) R. ¶ 16). Schwab received a copy of the DiMucci–Wal–Mart Letter of Intent on August 27 via facsimile (G. 12(N) ¶ 30).

DiMucci ultimately completed the Cicero project but has not paid $250,000 to GLS. Wal–Mart has neither made a $500,000 (or any) payment nor offered any further development contracts to GLS.

### Enforcement of the Oral Contract

Wal–Mart first claims that GLS has sued on the basis of an unenforceable oral contract. Wal–Mart argues that even should Schwab's testimony about the August 24 telephone call between him and Black be accepted in its entirety, no meeting of the minds occurred as to essential terms of the purported agreement. Further, Wal–Mart argues, any agreement that the parties might have reached lacks the specificity and definiteness required of an oral contract to be enforced under Illinois law. Both of those contentions must fail if GLS is to survive the present motion.

On the first of those issues this Court must examine whether a trier of fact (a jury in this case), if it accepted GLS' version of any disputed facts, could determine that the parties agreed on the essential terms of an understanding and that the parties intended to be bound to that oral agreement (*M.T. Bonk Co. v. Milton Bradley Co.,* 945 F.2d 1404, 1407 (7th Cir.1991)). If that first hurdle is overcome, this Court must then examine whether the terms of the proposed contract are sufficiently definite and certain to be enforceable at law (*id.*). In that respect such cases as *Academy Chicago Publishers v. Cheever,* 144 Ill.2d 24, 29, 161 Ill.Dec. 335, 337, 578 N.E.2d 981, 983 (1991) teach that "in order for a valid contract to be formed, an 'offer must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain.'" Even if the parties manifest an intent to make a contract, "if the content of their agreement is unduly uncertain and indefinite no contract is formed" (*id.*).

GLS points to two promises as having been made by Wal–Mart in the course of the August 24, 1993 phone conversation between Black and Schwab:

> 1. to "take care of" a $500,000 cash payment to GLS;[4] and
>
> 2. to use GLS as the real estate developer in "a few" additional Wal–Mart projects.

---

**4.** As set out in the *Facts* section, Black's promise was testified to by Schwab both in terms of "making sure that GLS would be taken care of" in the amount of $500,000 and "that's what you'll be paid." To avoid awkward repetition and without any intention to distort the language, this opinion will employ the locution just stated in the text.

Those promises call for separate analysis, for even if one distinct provision of a oral contract is found to be too indefinite to be judicially enforceable, other more definite provisions may survive and be enforced (*Apostolos v. R.D.T. Brokerage Corp.*, 159 A.D.2d 62, 559 N.Y.S.2d 295, 298 (1990); cf. *Pace Communications, Inc. v. Moonlight Design, Inc.*, 31 F.3d 587, 594–95 (7th Cir. 1994)).

### *"Taking Care of" a $500,000 Payment*

At the outset a few words should be said on a subject that (somewhat surprisingly) neither party has addressed in these terms: the potential applicability of the Illinois parol evidence rule to Wal–Mart's first promise. After all, Black and Schwab failed to include any reference to the $500,000 payment in their August 27 exchange of letters, and the entire thrust of the parol evidence rule is to bar consideration of oral promises that antedate the parties' written agreement.

■ On examination, though, that potential problem is seen to be a straw man (rendering Wal–Mart's omission of that line of attack less surprising). For the parol evidence rule to kick in, the writing that would preempt earlier oral promises must be a "fully integrated" embodiment of the parties' understanding—and that is so only if the parties intend it to be the expression of their entire agreement (*Merk ˙v. Jewel Food Stores*, 945 F.2d 889, 892–93 (7th Cir.1991)). And here, albeit for different reasons, neither GLS nor Wal–Mart suggests that the document resulting from the August 27 letter exchange was an expression of the parties' entire agreement:

1. GLS contends that it left the $500,-000 payment out only because GLS was not concerned with Black's honoring her commitment to that term (G. 12(N) Supp. 27).

2. Wal–Mart suggests that any possible contract between the two parties was purely oral, and that the August 27 document was to have no binding contractual effect at all.

Because in either view the document was thus not intended to be a completely integrated writing, evidence of "consistent additional terms" may be introduced (*Merk*, 945 F.2d at 893).

Now to the substantive enforceability of Black's promise to "take care of" the $500,-000 payment to GLS. Wal–Mart first urges that the parties reached no meeting of the minds as to *who* would pay that sum to GLS. As Schwab has testified, the specific entity responsible for making the payment "was left open ended" (G. 12(N) ¶ 24(d)-(f)). Schwab did not insist that the payment be made by either DiMucci or Wal–Mart, but relied on Black's promise "to make sure I was paid one way or the other" (Schwab Dep. 20). Wal–Mart argues that the absence of a designated payor reflects failure by the parties to come to agreement on an essential term of the contract.

To be sure, if that absence were enough to make Black's (and hence Wal–Mart's) promise to "take care of" GLS too indefinite to be enforceable, Wal–Mart's contention would have force. *Goldstick v. ICM Realty*, 788 F.2d 456, 461 (7th Cir.1986) (citation omitted) is exemplary of the numerous cases holding that courts will not look to the subjective intent of the parties to enforce a facially indefinite agreement:

> The common law principle that a contract cannot be enforced if its terms are indefinite retains a core of vitality. If people want the courts to enforce their contracts they have to take the time to fix the terms with reasonable definiteness so that the courts are not put to an undue burden of figuring out what the parties would have agreed to had they completed their negotiations.

■ But a jury considering the facts in a light reasonably favorable to GLS would surely be entitled to view Wal–Mart's characterization as unduly strained, opting instead for Schwab's reading of the promise. There is really nothing indefinite as a matter of law in a party's promise to make sure that the promisee will receive a payment in all events, either directly from the promisor or from another source or both—implicit in such a promise is the promisor's undertaking that if and to the extent that it did not otherwise

arrange for payment, it would provide the funds itself.

From that perspective it should be noted that during the very conversation in which Black promised Schwab that Wal–Mart would take care to seeing that GLS received this money, the two of them had specifically and repeatedly discussed the $500,000 figure (Schwab Dep. 18). Although Black never confirmed that promise in writing, she did acknowledge the agreement to pay GLS $500,000 on numerous subsequent occasions (W. 12(N) R. ¶ 28). Wal–Mart wanted to eliminate any interference that GLS' contractual rights might have posed to the Cicero development, and Black's language is reasonably to be read as an assurance that GLS would be paid "one way or the other" (Schwab Dep. 20).

And in that sense Black's "take care of" language is certainly not so uncertain or indefinite to be unenforceable as a matter of Illinois contract law. Courts will refuse to enforce an intended agreement only where "the essential term or terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken" (*Delcon Group, Inc. v. Northern Trust Corp.,* 187 Ill.App.3d 635, 643, 135 Ill.Dec. 212, 217, 543 N.E.2d 595, 600 (2d Dist.1989)). If a jury finds as a matter of fact that Black's statements represented a promise by Wal–Mart that GLS would be paid $500,000 in all events, Black's "take care of" language is sufficiently precise to be enforced as such a promise.

Wal–Mart's second attack on the enforceability of Black's "take care of" language is that it does not specify *when* payment was to be made. But it is not at all clear as a matter of fact that there was a fatal lack of understanding on that score. While neither Black nor Schwab appears to have specified a particular payment date during their August 24 conversation, a factfinder may infer agreement to a term based on a construction that the parties have given their agreement by earlier or later conduct or both (*Vandevier v. Mulay Plastics, Inc.,* 135 Ill.App.3d 787, 791, 90 Ill.Dec. 558, 561–62, 482 N.E.2d 377, 380–81 (1st Dist.1985)). As a point of reference, GLS points to its prior agreement with Wal-

Mart to make an identical $500,000 payment to DiMucci when GLS took over the project. Part of the arrangements approved by Wal–Mart required GLS to make that payment when it closed the purchase of the Cicero real estate (Schwab Aff. ¶ 2). Alternatively the jury might find an agreed payment date based on Wal–Mart's later conduct, in which Black negotiated for DiMucci to make a $250,000 payment to GLS when the city's financing bonds were funded (G. 12(N) ¶ 29). In any case a material fact remains in issue.

■ Suppose though that the jury concludes that Wal–Mart and GLS reached no agreement as to the payment date. Even so, that alone would not make the terms of the Wal–Mart promise so indefinite as to render it unenforceable as a matter of law. Although a contract must be clear, definite and complete in all of its material provisions, the lack of nonessential details will not render the contract unenforceable (*First Nat'l Bank v. Minke,* 99 Ill.App.3d 10, 14, 54 Ill.Dec. 499, 502–03, 425 N.E.2d 11, 14–15 (1st Dist.1981)). "Minor items may be left to the option of one of the parties or may be determined by what is customary or reasonable" (*Yoder v. Rock Island Bank,* 47 Ill.App.3d 486, 490, 5 Ill.Dec. 755, 759, 362 N.E.2d 68, 72 (3d Dist.1977)). While the date of performance is frequently a term essential to contracts involving services or the sale of goods (*Academy Chicago Publishers,* 144 Ill.2d at 29–31, 161 Ill.Dec. at 338, 578 N.E.2d at 984), the date on which GLS was to be paid was a detail far removed from the core of the Black–Schwab agreement. In substance GLS was being paid to "walk away" from a lucrative deal in which it had a contractual right so that another developer (DiMucci) might take the job. With neither party to the August 24 agreement having made an issue of the payment's timing, a reasonable period can be implied (and if so, there is no doubt that far more than a reasonable time has since elapsed).

*Providing "a Few" Additional Projects*

Wal–Mart has launched similar attacks upon Black's oral promise to provide GLS with "a few" additional Wal–Mart developments. Because the oral agreement between Black and Schwab included no discussion of

any specific Wal–Mart projects—no mention of such basic project identification as location, timeframe, type of store, store size or project cost—Wal–Mart argues that the promise is too indefinite to create an enforceable legal contract. This time Wal–Mart is right: As to this part of the alleged contract, the inherent vagueness and imprecision of the promise renders summary judgment appropriate to dismiss GLS' claim.

As a preliminary matter, a few moments may be spent on a basic contract issue of battling forms and the mirror-image rule. GLS takes no clear position as to which of three possible versions of Wal–Mart's promise to provide future developments it seeks to have enforced: (1) Black's August 24 oral promise to provide "a few" additional developments, (2) Schwab's August 27 letter requiring Wal–Mart to provide "two (2) future site locations" or (3) Black's modification of the August 27 letter, stating that Wal–Mart "will use its best efforts to find another location." In light of such repeated modifications in terms, the enforceability of any version turns on a preliminary finding of a valid offer and acceptance to mutually agreeable terms (*Anand v. Marple,* 167 Ill.App.3d 918, 920, 118 Ill.Dec. 826, 828, 522 N.E.2d 281, 283 (3d Dist.1988)):

> It is elementary that for a contract to exist there must be an offer and acceptance, and the acceptance must comply strictly with the terms of the offer. A conditional acceptance or one which introduces new terms that vary from those offered constitutes a rejection of the original offer and becomes a counterproposal which must be accepted by the original offeror before a valid contract is formed.

Although GLS most optimistically seeks to recover on the basis of Black's August 24 promise of "a few"—read by GLS to be at least three—developments, it has also argued for the enforcement of Black's August 27 "best efforts" language as an effective modification to the parties' contract. In that respect, because Black's written modification of

Schwab's August 27 letter clearly constituted a rejection of the terms of his offer and a counterproposal (*Anand, id.*), whether GLS ever accepted that "best efforts" counteroffer would be a question of fact to be resolved by the jury.[5]

But that need not be resolved, for this Court finds that *neither* Black's original oral promise nor the "best efforts" modification is sufficiently definite to be enforceable as a contract in Illinois. In light of GLS' alternative contentions, this opinion will address each of the two possible agreements in turn.

■ Black's August 24 promise to GLS was that in addition to "taking care" of the $500,000 payment to GLS, Wal–Mart would give GLS "a few" additional projects to develop in lieu of the Cicero development (G. 12(N) ¶ 24(c)). As GLS has admitted (G. 12(N) ¶ 24(r)):

> In fact, Kim Black did not specify *any* details concerning any additional projects and Gary Schwab did not inquire as to any details during the August 24, 1993 telephone conversation.

More specifically, GLS has conceded that the parties failed to agree upon, or even to discuss, a number of matters:

> Kim Black did not refer to any specific Wal–Mart project she was willing to give to GLS (G. 12(N) ¶ 24(i)).

> Kim Black did not state the location of any project she would give to GLS (G. 12(N) ¶ 24(j)).

> Kim Black did not state the time period within which she was going to give additional projects to GLS (G. 12(N) ¶ 24(k)).

> Kim Black did not specify whether the projects would be Sam's Club or Wal–Mart stores (G. 12(N) ¶ 24(1)).

> Kim Black did not specify whether the projects would involve shopping centers or free-standing stores (G. 12(N) ¶ 24(m)).

> Kim Black did not state the size of the additional projects (G. 12(N) ¶ 24(n)).

---

5. Schwab's testimony as to whether on GLS' behalf he ever accepted Black's counteroffer is inconclusive and would require resolution by a factfinder. Although Schwab testified at one point that he positively did not accept the changes Black made to the August 27 letter (Schwab Dep. 90), he had testified earlier that he "was reluctant and felt forced into taking the scratched out letter" (Schwab Dep. 85).

Kim Black did not mention any particular geographic territory within which the additional projects would be located (G. 12(N) ¶ 24(o)).

There was no discussion of the dollar value of any additional projects (G. 12(N) ¶ 24(q)).

If the concept of "a few" projects were independently precise enough to create an enforceable contract under Illinois law, the omission of some or all of those matters from the parties' mutual understanding would pose no problem. But both the common sense of contract law and the understandable absence of any case law to that effect dictate otherwise. To the contrary, the content that is required of any such agreement for its enforceability makes the parties' failure to come to terms on such matters fatal to any possible finding of a binding contract.

On that score, GLS' own GR 12(N) supplement of material facts demonstrates the wide range of development possibilities upon which the parties might later have come to agreement. For example, GLS might have been asked to do a "straight development deal" where GLS owned the property and entered into a long-term lease with Wal–Mart. In that event GLS could expect a rate of return of "at least" 9.5% to 10.5% (G. 12(N) Supp. ¶ 24).[6] Of course variables such as the type, size, timing of construction and long-term rent adjustments would necessarily depend on the individual project (id.). Alternatively GLS might have been asked to do a "fee development" or "turnkey" deal, where GLS would have handled all development details as the agent on Wal–Mart-owned property. Under such an arrangement GLS has represented that it could have expected a fixed fee of 5% (G. 12(N) Supp. ¶¶ 23, 25).

In sum, any agreement by Wal–Mart that GLS would receive "a few additional projects" is insufficient to form the basis of an enforceable contract under Illinois law. Not only are the terms contained in that oral promise too indefinite as a matter of law (*Delcon Group*, 187 Ill.App.3d at 643, 135 Ill.Dec. at 217, 543 N.E.2d at 600), but relatedly the parties have not reached an understanding on specific matters essential to an agreement to undertake future developments (*M.T. Bonk*, 945 F.2d at 1407). Given the tremendous variety of types, designs and sizes of future Wal–Mart "projects"—and thus, quite critically, the different levels of profitability to GLS—the terms of Black's August 24 oral promise are "so uncertain that there is no basis for deciding whether the agreement has been kept or broken" (*id.*).

■ And the same deficiency exists in the proposed agreement "modification" that incorporates Black's August 27 written promise for Wal–Mart to use its "best efforts" to find another location. Although Illinois courts have not categorically rejected all contracts that explicitly require "best efforts" performance, the mere inclusion of that term is not alone sufficient to create an enforceable agreement (*Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992)). Black's August 27 written proposal still specifies only that GLS will receive "another location." As such, the August 27 version is legally unenforceable for exactly the same reasons that Black's August 24 oral promise has just been held too indefinite as a matter of law.

Thus no matter which version of Wal–Mart's offer to provide future developments would be found as a matter of fact to have been accepted by GLS—Black's August 24 written proposal or her August 27 written "best efforts" modification—the promise is unenforceable as a matter of Illinois law. That entitles Wal–Mart to a partial judgment of dismissal.

---

**6.** In terms of the "straight development" deal alone, GLS' representation that it would receive "at least" a 9.5% to 10.5% rate of return reflects substantial upside room for individual deal-by-deal negotiation. No industry-wide "customary" rate can be said to exist. Further, as a practical matter, the 1% differential in the range GLS presents is not insubstantial. On the Cicero deal alone, which had an approximate expected cost of $25 million, such a differential would allow for $250,000 of additional profit or savings based on deal-specific negotiation. In light of such uncertainty, how can this Court be expected to find enforceable a contract that specifies only "additional developments"? And relatedly, how can a jury then decide on a reasonable figure to be awarded as damages based on a breach of these terms?

## Statute of Frauds

Next Wal–Mart challenges the enforceability of the entire August 24, 1993 oral agreement between Black and Schwab under Illinois Frauds Act § 2, 740 ILCS 80/2.[7] Wal–Mart argues that the oral agreement involved two distinct transfers of interests in land:

1. GLS agreed to "walk away" from an interest it had acquired in the Cicero property.

2. Wal–Mart promised future projects that would necessarily involve the future transfer of land to GLS.

Because no signed writing exists to support any such alleged transfers, Wal–Mart urges that the entire August 24 agreement is voidable.

■ Frauds Act § 2 reads:

No action shall be brought to charge any person upon any contract for the sale of lands, tenements or hereditaments or any interest in or concerning them, for a longer term than one year, unless such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by such party.

Three requirements must be satisfied to avoid a properly raised statute of frauds defense: (1) there must be a written memorandum or note on one or more documents, (2) the documents collectively must contain a description of the property and the terms of sale, including price and manner of payment, and (3) the memorandum or note must contain the signature of the party to be charged (*Prodromos v. Poulos,* 202 Ill.App.3d 1024, 1028, 148 Ill.Dec. 345, 349, 560 N.E.2d 942, 946 (1st Dist.1990)). Although application of the statute of frauds is a question of law, any underlying matters of contested fact that are necessary to the statute's application must first be decided by the jury (19A I.L.P. *Statute of Frauds* § 63). In this case several material facts are at issue to preclude application of the statute on the current motion for summary judgment.

■ Initially, a question of fact clearly exists as to whether GLS fully performed its own duties under the August 24 oral contract. In Illinois an oral contract is not voidable under the statute of frauds if the contract has been completely performed by one party. "Executed contracts, as opposed to executory contracts, are never voided by the Statute of Frauds" (*Estate of Jesmer v. Rohlev,* 241 Ill.App.3d 798, 806, 182 Ill.Dec. 282, 288, 609 N.E.2d 816, 822 (1st Dist.1993)). Here GLS contends that it has fully performed its part of the disengagement agreement, having ceased its development activities on or about August 27 (First Amended Complaint ¶ 20). That contention appears to be supported by the text of the August 27 letter (Answer to Complaint Ex. A), as well as by the fact that DiMucci ultimately served as developer on the Cicero project.

Additionally, an issue of fact exists as to whether the portion of the August 24 contract that is sufficiently definite to be enforceable at law—Wal–Mart's offer to "take care of" a $500,000 payment in exchange for GLS's agreement to "walk away" from its contractual rights—involves a transfer of land. Although Schwab testified to his understanding that GLS had some interest in the Pacella option property before the August 24 conversation (Schwab Dep. 218–20), it is not at all clear that GLS ever had such a legal interest. GLS' original July 21 offer to Wal–Mart proposed to accept assignment of the Pacella option (Complaint Ex. 1), but Wal–Mart's August 2 acceptance said that Wal–Mart had exercised the option itself and would only begin "preparing an Assignment Agreement" (Complaint Ex. 2). Wal–Mart does not assert that such an agreement was

---

7. Interestingly, Wal–Mart does not seek to invoke the portion of Frauds Act § 1 (740 ILCS 80/1) that renders unenforceable an oral "special promise to answer for the debt, default or miscarriage of another person"—a provision that would be brought into play if Wal–Mart's promise to "take care of" the $500,000 payment to GLS were viewed as a promise to make good on DiMucci's performance of *its* obligation to make such a payment. That omission on the part of Wal–Mart's counsel tends to support the notion that this Court's earlier-expressed (and quite different) reading of that promise is the correct one, even though Wal–Mart disagrees as to the enforceability of the promise in any event.

ever effected. Hence while GLS quite clearly had contractual rights to serve as developer of the Cicero Sam's Club project as of August 24, an issue of material fact exists as to whether GLS actually had a legal interest in the Cicero real estate that would cause its agreement to be for the sale of an interest coming within the scope of Fraud Act § 2.

■ Nor does the inclusion of Wal–Mart's second promise to provide GLS with additional development deals void the otherwise enforceable provisions of the August 24 oral agreement. As an initial matter, that portion of the agreement is not properly subject to the statute of frauds. Although Schwab testified to his understanding that any future development would require a transfer of land from Wal–Mart (Schwab Dep. 31–32), Black's August 24 promise did not itself serve to sell land or to yield any interest in land to GLS. No writing could possibly exist to satisfy the statute's requirement of a signed document "contain[ing] a description of the property sold" (*Sims v. Broughton,* 225 Ill.App.3d 1076, 1080, 168 Ill.Dec. 656, 659, 589 N.E.2d 1056, 1059 (5th Dist.1992)), precisely because the August 24 agreement did not serve to transfer a property interest. Indeed, while the parties may have sought on August 24 to establish some vague contractual duty of Wal–Mart to offer future developments to GLS, any particular offer would have required acceptance by GLS, and any later land transfers would have required particularized agreements and documents. So GLS received no legal interest in any Wal–Mart land as a result of Black's August 24 promise to provide future deals.

■ Finally, even if Wal–Mart's promise to provide additional developments were somehow voidable under the statute of frauds (as it is not), the other provisions of the contract would still remain enforceable. Where an oral contract is readily divisible into two or more independent parts, those parts may be considered separately for enforcement under the statute of frauds (*Apostolos,* 559 N.Y.S.2d at 298 (citation omitted)):

> As a general rule, if part of an entire contract is void under the statute of frauds, the whole contract is void. However, where an oral agreement is a severable

one, i.e., susceptible of division and apportionment, having two or more parts not necessarily dependent upon each other, that part which, if standing alone, is not required to be in writing, may be enforced, provided such apportionment of the agreement may be accomplished without doing violence to its terms or making a new contract for the parties.

This opinion has already found Wal–Mart's promise to "take care of" a $500,000 payment sufficiently definite to be enforced under Illinois law, independently of Black's separate promise to provide additional locations. Clearly, then, those promises may be severed for purposes of the statute of frauds without doing violence to the agreement's terms or making a new contract for the parties.

### Adequate Consideration

Wal–Mart's final attempted onslaught on the oral agreement between Black and Schwab is a contention that it fails for lack of mutual consideration. Pointing to GLS' July 21 offer to develop the Cicero property, Wal–Mart argues that the execution of a successful tax increment financing ("T.I.F.") agreement between GLS and Cicero by September 2 was a condition precedent to an enforceable development contract. As of August 24 (the date of the oral agreement now at issue), GLS had not yet met with Cicero officials to discuss the T.I.F. agreement (G. 12(N) ¶ 25(i)). Further, it was Schwab's understanding on August 24 that Cicero would not enter into such an agreement with GLS (G. 12(N) ¶ 21). As Wal–Mart would have it, that means that a condition precedent to GLS' offer was not satisfied, so that GLS' promise to "walk away" from its contractual rights was meaningless.

■ In Illinois as elsewhere, "[v]aluable consideration consists of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other" (*Palmetto Leasing Co. v. Chiles,* 235 Ill.App.3d 986, 989, 176 Ill.Dec. 770, 772, 602 N.E.2d 77, 79 (2d Dist.1992)). One party's release of some right that it has under a contract may constitute sufficient consider-

ation to support another contract (12 I.L.P. *Contracts* § 74). Courts will inquire to determine whether a contract is supported by consideration, but they will not scrutinize the adequacy of that consideration (*Goodwine State Bank v. Mullins*, 253 Ill.App.3d 980, 1011, 192 Ill.Dec. 901, 924, 625 N.E.2d 1056, 1079 (4th Dist.1993)).[8]

■ Although Wal–Mart correctly identifies the proposition of Illinois law that for one party's promise or act to constitute consideration it must be regarded as such by the parties and must be undertaken at the instance of the other party (*Garber v. Harris Trust & Sav. Bank*, 104 Ill.App.3d 675, 680, 60 Ill.Dec. 410, 414, 432 N.E.2d 1309, 1313 (1st Dist.1982)), Wal–Mart's invitation for this Court to reject GLS' agreement to "walk away" on the August date as meaningless (and hence as a failure of consideration) must itself be rejected. At its core that invitation equates to a direct violation of the prohibition against judicial evaluations of the adequacy of consideration. That time-honored and still valid concept stems from basic notions of freedom of contract [9]—the principle that the informed decision by a party exchanging a promise for a promise that what it is receiving is worth what it is giving [10] may not later be second-guessed by that party, nor may the party ask a court to engage in such post hoc revisionism.

Just so here. On August 24 Wal–Mart wanted to go ahead with the Cicero development, and it viewed GLS as an impediment to its accomplishment of that goal. It made a value judgment that it was worth $500,000 to get GLS to step aside so that Wal–Mart could pursue an alternate route to that goal. It has no claim of legal duress or any other claim (such as inequality of bargaining power, contract of adhesion or the like) to relieve it from its voluntarily made promise. There is no more justification for Wal–Mart's attempted hindsight repudiation of that voluntary promise, just because it now says that GLS could not have succeeded if it had stayed in the deal, than there would be for a hindsight repudiation by Wal–Mart if (and because) DiMucci—with whom it had chosen to proceed—had struck out, so that Wal–Mart did not obtain the economic benefit that it had hoped for.

So Wal–Mart's lack-of-consideration argument falls of its own weight, without any need to look at the value of what GLS gave up from some outside perspective. But even though no such examination is required, it may be worth observing that Wal–Mart's position would confront problems in those terms as well. On August 24 Wal–Mart faced the time pressure of having its option to purchase the Pacella property expire on September 1 (30 days after its August 2 exercise date), at which point Wal–Mart would lose $250,000 of earnest money and control of the land. GLS, however, still had until September 2 to reach agreement with Cicero. Those business realities required that Wal–Mart be released from its remaining contractual obligations to GLS immediately to remove any barrier to DiMucci's path to closing on the property. Wal–Mart's perception of those realities is reflected in the testimony of DiMucci's Filler that Black urged DiMucci to include the $250,000 payment to GLS in its Letter of Intent to get GLS to walk away so the project could "go forward" (W. 12(M) R. ¶ 16).

Further, GLS' contractual power was not simply limited to holding up the Cicero development. GLS might ultimately have been

---

**8.** *Goodwine, id.* goes on to repeat the recognized safety valve exception that kicks in if "the amount [of consideration] is so grossly inadequate as to shock the conscience of the court." Where as here there was an arm's length bargain reached between two substantial business entities (and Wal–Mart can scarcely claim inequality of bargaining power), that potential exception is patently inapplicable.

**9.** All lawyers are familiar from law school days with the classic "peppercorn" example—the proposition stated succinctly in *In re Xonics Pho-*

*tochemical, Inc.*, 841 F.2d 198, 202 (7th Cir. 1988):

Nominal consideration is, in general, all that is needed to satisfy the requirements of the law of contracts (see 2 Blackstone, Commentaries on the Laws of England 440 (1766) ("peppercorn"); Farnsworth, Contracts §§ 2.11–.14 (1982))—a requirement of adequate or commensurate consideration would gravely undermine freedom of contract. . . .

**10.** That exchange may of course involve, on either side of the bargain, a promise to pay money.

successful in performing under the contract. Cicero Town Attorney Both has testified that it was not his intention to rule out the use of GLS as the developer of the Cicero Sam's Club Project (W. 12(M) R. ¶ 14). Further, upon being notified in early December 1993 that no developer had yet closed on the Pacella property, Both was willing to negotiate with any party who obtained control of the property (Both Dep. 68–71). Although Schwab did not know those details on August 24, he still had nearly ten days to perform under the original bargain and in which to press discussions with Both. Further, GLS might have bargained with Pacella to extend the option period—as Wal–Mart ultimately did without cost (W. 12(N) R. ¶ 8)—or might even have waived the condition precedent to its offer.

Again this Court need not scrutinize the probability of any or all possible scenarios, for Wal–Mart's own contemporaneous evaluation that $500,000 was the right price to pay for GLS' withdrawal is conclusive. But it is also clear from the other side of the bargain that GLS did waive a meaningful legal right through Schwab's August 24 promise to "walk away." In all events, Wal–Mart's promise to "take care of" a $500,000 payment in exchange for that promise is not unenforceable for want of consideration.

*Conclusion*

GLS identifies two oral promises as having been made by Wal–Mart in consideration for GLS' agreement to walk away from its contractual rights and opportunities in the Cicero Sam's Club redevelopment. While the second of those promises—Wal–Mart's agreement to use GLS as the real estate developer in additional Wal–Mart projects— is unenforceable as a matter of law, genuine issues of material fact must be resolved as to the first. Surely a jury might reasonably conclude that Wal–Mart promised that a $500,000 payment would be made to GLS to allow the Cicero project to go forward in a timely fashion. Hence Wal–Mart's motion for summary judgment is granted as to GLS' claim to recover on the promise of future developments, but denied as to GLS' claim to recover on Wal–Mart's promise to "take care of" a $500,000 payment.